CHEROKEE BRICK & TILE CO.

v.

UNITED STATES.

Civ. No. 1069.

United States District Court,
M. D. Georgia, Macon Division.

June 4, 1954.

Bloch, Hall, Groover & Hawkins, Macon, Ga., Sutherland, Asbill & Brennan, Atlanta, Ga., Charles J. Bloch and J. Rene Hawkins, Macon, Ga., W. A. Sutherland and Joseph B. Brennan, Atlanta, Ga., of counsel, for plaintiff.

Frank O. Evans, U. S. Atty., Macon, Ga., Floyd M. Buford, Asst. U. S. Atty., Macon, Ga., Andrew D. Sharpe, J. W. Hussey, Sp. Assts. to Atty. Gen., for defendant.

DAVIS, Chief Judge.

In this action the plaintiff seeks a refund of income and excess profits taxes which it claims were erroneously assessed and collected. The sole point of dispute is the amount of depletion allowance properly allowable to the taxpayer in its return for the short fiscal period January 1, 1951 to September 30, 1951. This is a question of statutory construction and application, involving the definition of terms and the application of them to the facts in the case. There is no dis-

pute as to any of the material facts. The parties are in agreement as to the amount of tax paid, the amount of deficiencies assessed, the amount and date of the payment of deficiencies, the filing of the claims for refund and all other pertinent facts.

Under the applicable statutes, the plaintiff was entitled to a deduction for depletion equivalent to 5% of the gross income from the property, which is defined in the statute as the gross income from mining. It is at this point that the parties disagree. The plaintiff contends that the gross income from mining in this case is the selling price of the finished brick and tile, f. o. b. plant, loaded for shipment. The defendant, on the other hand, contends that the gross income from mining is about one-fifth of the total sales price of the finished brick and tile. Before going further into these contentions and the controlling statutes and regulations, I think it would be well to have a clear understanding of the plaintiff's business.

The plaintiff owns and operates three clay pits and is engaged in mining clay from these pits and making brick and tile therefrom in three plants located near the pits. The plaintiff has sold only negligible amounts of raw clay and none of this was sold for use in the making of brick and tile. Brick and tile clay, on which a depletion allowance is granted, is defined as including only clay which is used or sold for use in the making of common brick and kindred products. It is agreed by the parties that the raw clay sold by the plaintiff does not come within this definition. It is further agreed that there is no market for raw brick and tile clay as thus defined, and there is no market for such clay until it is put in the form of burnt brick and tile. Only negligible amounts of the brick and tile clay mined in the United States can be sold before being processed into burnt brick and tile and it is here agreed that these negligible amounts are not material to this case.

The following are the processes by which the plaintiff processes the raw clay into burnt brick and tile:

(a) The clay is mined by draglines and loaded in dump cars, which operate on railroad tracks and carry the clay to the plant.

(b) The clay is dumped from the cars into large granulators or crushers, which mix the clay and reduce the large chunks to a size that can be carried on a conveyor belt.

(c) The clay is discharged from the granulators or crushers on conveyor belts which usually carry it to a storage shed where it is weathered.

(d) The clay weathered in the storage shed is then loaded into a feeder which discharges onto a conveyor belt which carries the clay to a set of disintegrator rolls and a set of smooth rolls, which further reduce the size of the chunks. If the clay is not weathered in the storage shed, it is carried by the conveyor belt on which it is loaded from the granulators or crushers to the disintegrator rolls and smooth rolls.

(e) From these rolls the clay is discharged onto another conveyor belt, which carries it to another granulator, where the clay is further crushed. Water is sometimes added at this point to temper the clay.

(f) From this granulator, the clay is carried on a conveyor belt to another set of rolls.

(g) From these rolls the clay is discharged into the pug mill, which is a machine wherein water is added as the final tempering process.

(h) From the pug mill the clay passes into the brick machine. It first goes into an evacuation chamber, where air is evacuated from the clay by a vacuum pump. The clay then passes into the extrusion section of the machine, where it is forced under pressure through various types of dies in long ribbons.

(i) The long ribbons of clay as extruded through the dies pass into the cut-

ting machine, which cuts them into clay units of the desired size.

(j) The clay units as cut pass onto a conveyor belt and are then stacked on dryer cars, which are moved to the dryer tunnels, where free water is evaporated from the clay units by fans which blow hot air on them.

(k) When the free water is thus removed, the clay units either are stacked in periodic kilns, or, in the case of continuous or tunnel kilns, are left on the dryer cars which continue from the dryer to the kiln.

(l) The clay units are then burned, either in periodic or continuous (or tunnel) kilns.

(m) The burnt brick and tile is then removed from the kilns.

(n) After it has been removed from the kilns, the burnt brick and tile is loaded for shipment to purchasers.

These processes are the ordinary ones employed in the industry in mining raw clay and processing it into burnt brick and tile.

As stated, the depletion allowances is 5% of the gross income from mining as defined in the applicable statute. The plaintiff contends that all of the above processes come within the statutory definition of mining and that the proper depletion allowance is 5% of the selling price of its burnt brick and tile f. o. b. plant, loaded for shipment.

The defendant contends that only processes (a) through (e) as enumerated above are mining and that the depletion allowance should be limited to 5% of the income attributable to those processes. Since there is no market for brick and tile clay which has undergone processes (a) through (e), the defendant arrived at the gross income from such processes by a method of allocation. This method of allocation assumes that the gross income allocable to processes (a) through (e) bears the same relation to the income from all the processes as the cost of processes (a) through (e) bears to the cost of all the processes. By application of this formula the defendant held that the gross income from processes (a) through (e) was approximately one-fifth of the selling price of the brick f. o. b. plant, loaded for shipment.

The question then is simply this: Does the gross income from mining as defined in the statute include the gross income from all of the processes enumerated above, or only that amount of gross income attributable to certain ones of the processes? To determine this question, it is necessary to look to the definition of the term mining, as set forth in the statute and regulations.

The pertinent portion of Section 114 of the Internal Revenue Code provides, as follows:

"(b) Basis for depletion

\* \* \* \* \* \*

"(4) (A) The allowance for depletion under section 23(m) in the case of the following mines and other natural deposits shall be—(i) in the case of \* \* \* brick and tile clay, \* \* \* 5 per centum, \* \* \* of the gross income from the property during the taxable year, \* \* \*.

"(B) Definition of gross income from property. As used in this paragraph the term 'gross income from the property' means the gross income from mining. The term 'mining' as used herein shall be considered to include not merely the extraction of the ores or minerals from the ground but also the ordinary treatment processes normally applied by mine owners or operators in order to obtain the commercially marketable mineral product or products, and so much of the transportation of ores or minerals \* \* \* from the point of extraction from the ground to the plants or mills in which the ordinary treatment processes are applied thereto as is not in excess of 50 miles \* \* \*. The term 'ordinary treatment processes', as used herein, shall include the following: (i) In the case of coal— \* \* \* (ii) in the case of sulphur— \* \* \*; (iii) in the case of iron ore

* * *, and minerals which are customarily sold in the form of a crude mineral product—* * *; and (iv) in the case of lead, zinc, copper, gold, silver, or fluorspar ores, potash, and ores which are not customarily sold in the form of the crude mineral product—crushing, grinding, * * * (but not including as an ordinary treatment process electrolytic deposition, roasting, thermal or electric smelting, or refining), or by substantially equivalent processes or combination or processes used in the separation or extraction of the product or products from the ore, including the furnacing of quicksilver ores." 26 U.S.C.A. § 114.

It is agreed by all parties that (i), (ii), and (iii) above are not applicable to brick and tile clay. There is a dispute as to whether brick and tile clay comes within the provisions contained in (iv). These contentions will be explored in connection with the applicable regulation dealing with the provision contained in (iv.) Reserving this question, the other provisions of the statute clearly provide that mining shall include * * * the ordinary treatment processes normally applied by mine owners or operators in order to obtain the commercially marketable mineral product or products.

 The parties to this case agree that the processes here involved are those normally used by the industry. The plaintiff contends that the first commercially marketable product of its business is the burnt brick and tile. The defendant contends that burnt brick and tile is a manufactured product and that the term "commercially marketable product" does not actually mean that there must be a market for it, but assign to the term some esoteric meaning. The defendant also tries to draw a line between those processes which they consider mining and those which they consider to be manufacturing. The statute does not exclude manufacturing processes as long as they are ordinary processes normally used in obtaining the commercially marketable mineral product.

 This Court believes the term "commercially marketable mineral product" is unambiguous and must be assigned its ordinary meaning; i. e., a mineral product marketable in commerce. Before a product can be considered commercially marketable there must exist a market for such product. It is agreed by the parties here that the first product for which there exists a market is the finished burnt brick and tile. The court is, therefore, of the opinion that under the general provisions of the statute, the contentions of the plaintiff are correct, in that all of the processes applied to the clay were ordinary treatment processes normally applied in order to obtain the commercially marketable mineral product. This interpretation of the general provisions of the statute lends itself to a more uniform application of the rule and will eliminate much speculation as to when mining stops. Had Congress intended by the use of the word mining to exclude all manufacturing processes, it would have been a simple matter to do so. Congress made no such distinction. It did not draw the line between mining and manufacturing as those two terms are ordinarily understood. Without doubt, Congress intended the word "mining" to be broader than it is generally understood, as shown by the words "shall be considered to include not merely the extraction of the ores or minerals from the ground."

 It is this Court's opinion that the "first commercially marketable product test" was used because at no earlier stage would it be possible to determine just what would be the gross income from mining. If it be determined that mining includes processes (a) through (h) how could this Court compute the gross income from such operations, where the product at that stage had no market? It is true that the Commissioner by regulations has provided that in such cases the income from each process shall be considered as proportionate to costs. This is obviously a pure fiction which might be false more often than true. Evidently, it was to obviate the necessity of using

such a fiction that Congress adopted the "first commercially marketable product" test to determine what acts constitute mining. In view of the fact that the treatment processes applied were the ordinary ones and that it is agreed that there is no market for brick and tile clay at any stage between extraction from the ground and loading of the finished burnt brick and tile, the Court can only conclude that under the statute gross income from mining is the selling price of the finished brick and tile, f. o. b. plant, loaded for shipment.

In view of the foregoing, the plaintiff should prevail here unless, as the defendant contends, brick and tile clay comes within the provisions of Section 114(b) (4) (B) (iv). That provision states that in the case of ores not customarily sold in the form of the crude mineral product, roasting is not an ordinary treatment. The implementing regulation, Section 29.23(m) (1) (f) of Treasury Regulations 111, as amended by T.D. 6031, provides that in the case of minerals which are not customarily sold in the form of the crude mineral product, roasting is not an ordinary process. It goes further and provides that the term "ordinary treatment processes" does not include fine pulverization, pressing into shape or molding. It is clear that, if this regulation is valid and applicable, any process involving heating, fine pulverization, pressing into shape or molding, would be excluded from the term "ordinary treatment processes", and the mining would be considered at an end prior to such processes. That portion of the regulation applies to all minerals which are not customarily sold in the form of the crude mineral product. This would include brick and tile clay.

■ It is to be noted, however, that the similar provision of the statute differs from the regulation in one important particular. Section 114(b) (4) (B) (iv) of the statute applies only to ores which are not customarily sold in the form of the crude mineral product. The defendant contends that there is no dis-

tinction between ores and minerals and that the words are synonymous. This Court does not agree. The term "minerals" includes ores; the term "ores" does not include minerals. It is argued that Congress did not intend such a distinction. Section 114(b) (4) (B) (iii) used the word "minerals" and it is not believed that the use of the word "ores" in the next sentence was simply accidental. The Commissioner's own action in promulgating his regulation shows that he considers the word "minerals" to be a more inclusive term. In drafting his regulation dealing with subdivision (iv) of the statute, he uses almost identical wording except that he substitutes the word "minerals" for ores. It is hardly likely that the Commissioner would have made this simple change in wording, had it made no change in meaning, and it is clear that he would not have used it to narrow the scope of the provision. The regulation enlarges the scope of that provision and goes beyond the statute to the extent that it applies a different test to some minerals than is provided for by the statute itself.

■ The statute provides that, with certain exceptions, mining shall include all ordinary processes normally applied to obtain the commercially marketable product. That portion of the regulation which seeks to enlarge the exceptions to the general rule goes beyond the statute and to that extent is without legal effect. The Commissioner may issue reasonable regulations explaining the statute but such regulations are ineffective if they go beyond the provisions of the statute.

■ This Court can only conclude that brick and tile clay is a mineral, not an ore, and does not fall within the exceptions to the general rule stated in the statute. It follows that the portion of the regulation which conflicts with the statute is ineffective to enlarge the scope of the exception.

This Court feels that its interpretation of the statute is in line with the reasoning of the decisions in the two cases

which have interpreted and applied the definition of "gross income from mining". New Idria Quicksilver Mining Co. v. Commissioner, 9 Cir., 144 F.2d 918; International Talc Co., Inc., v. Commissioner, 15 T.C. 981. In both of those cases it was held that the depletion deduction should be computed upon the selling price of the first commercially marketable product.

This Court feels that a contrary holding in the instant case would be to defeat the obvious intention of the Congress. Congress included in the statute the definitions here under consideration in order to clarify the law and lead to a uniform application of it. To give to the words used the meaning contended for by the defendant might well lead to confusion rather than clarification. This would lead to unending litigation, which in nearly every case could be finally adjudicated only by a ruling by the appellate courts. This present case is a clear forecast of events which would follow a contrary holding. The defendant here contended that mining ceased after the fifth process but in argument admitted that it might be that it should include one or two more of the processes. There was no stage in the operation which even the defendant could contend was clearly "the cut off place". In other words, the contention was that mining ceased after process (e) but it was admitted that this was not so clear as to be the only conceivable "cut off point." The difficulty of finding a definite "cut off point" in this case clearly shows the difficulty which may frequently arise in attempting to apply such a definition as that contended for by the defendant. It is not felt that Congress meant to create additional confusion in the tax laws which would make it more difficult for even the most conscientious taxpayer to determine the amount of taxes due by it.

The Court holds that the plaintiff is entitled to recover.

Let the plaintiff present a judgment in accordance with the findings and conclusions herein.