**MERRY BROTHERS BRICK AND
TILE COMPANY**

v.

**UNITED STATES of America.**

Civ. A. No. 752.

United States District Court
S. D. Georgia, Augusta Division.

July 3, 1956.

Fulcher, Fulcher & Hagler, W. M. Fulcher, Augusta, Ga., for plaintiff.

Charles K. Rice, Asst. Atty. Gen., Andrew D. Sharpe, Gerard J. O'Brien, Washington, D. C., and William C. Calhoun, U. S. Atty., Augusta, Ga., for the Government.

SCARLETT, District Judge.

This is an action for recovery of the principal amount of $361,932.06 paid by plaintiff as income and excess profits taxes, and interest thereon, for the calendar years 1951, 1952, 1953 and 1954. Deficiencies assessed in income and excess profits taxes for 1951 and 1952, and income taxes for 1953 which plaintiff claims should be refunded are as follows :

| Year | Deficiency | Interest |
|------|------------|----------|
| 1951 | $121,047.18 | $21,574.56 |
| 1952 | 84,458.15 | 9,835.31 |
| 1953 | 76,931.49 | 4,823.32 |

For 1954, plaintiff seeks to recover $68,383.69, which it claims it overpaid.

The only point at issue is the amount of percentage depletion properly allowable to plaintiff for each of the years mentioned.

Plaintiff moves the Court for summary judgment in its favor in accordance with the provisions of Rule 56(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A., on the ground that the pleadings and affidavits attached to the motion show that there is no genuine issue as to any material fact and that plaintiff is entitled to a judgment as a matter of law.

Defendant moves the Court to enter a summary judgment in its favor, pursuant to Rule 56, dismissing the complaint on the ground that there is no issue as to any material fact and that defendant is entitled to judgment as a matter of law as shown by the pleadings, the affidavits attached to plaintiff's motion, and the stipulation of fact between the parties.

Plaintiff claims that under the applicable statutes, it is entitled to deduction for percentage depletion of its clay lands on the basis of five percent of the selling price, f. o. b. plant, loaded for shipment, of the burnt brick and tile which it pro-

duces, and relies upon United States of America v. Cherokee Brick & Tile Co., 5 Cir., 218 F.2d 424, which affirmed Cherokee Brick & Tile Co. v. United States, D.C., 122 F.Supp. 59.

Defendant contends, on the other hand, that to correctly compute depletion plaintiff's operations should be classified into two groups, with certain of its processes placed in a group termed "mining" and the remaining processes placed in a group termed "manufacturing." The Commissioner of Internal Revenue undertook to make such classification with respect to plaintiff's processes, which processes are hereinafter listed alphabetically, by placing in the so-called "mining" group those processes designated as (a) through (e), and placing in the so-called "manufacturing" group processes (f) through (m). The Commissioner determined that, in each year involved here plaintiff's gross income from mining should be computed by dividing the direct mining costs by the total costs of mining and manufacturing, based upon his classification and terminology, and by then multiplying the resulting percentage by plaintiff's gross income. For the years in question, it was determined that plaintiff's gross income from mining amounted to the following percentages of its gross income from the sale of brick and tile, f. o. b. plant, loaded for shipment, to wit:

| Year | Percentage |
| --- | --- |
| 1951 | 12.81 |
| 1952 | 11.43 |
| 1953 | 11.74 |
| 1954 | 12.51 |

Based upon the method of computation contended for by defendant, it is argued that the maximum depletion to which plaintiff is entitled is 5% of 12.81% of plaintiff's sales of brick and tile, f. o. b. plant, loaded for shipment for 1951, 5% of 11.43% of such sales for 1952, 5% of 11.74% of such sales for 1953, and 5% of 12.51% of such sales for 1954.

The plaintiff owns and operates several clay pits and is engaged in mining clay from these pits and making brick and tile therefrom in two plants located near the pits. The plaintiff sells all of the clay which it mines in the form of burnt brick and tile, except for negligible amounts of raw clay, none of which is sold for use in the making of brick and tile. In 1951 the ratio of sales of raw clay to the clay processed and sold as brick and tile was .007233; in 1952 such ratio was .005977; in 1953 the ratio was .005467; and in 1954 such ratio was .002967. Brick and tile clay on which a depletion allowance is granted is defined as including only clay which is used or sold for use in the making of common brick and kindred products. The raw clay sold by plaintiff does not come within this definition.

The processes by which plaintiff processes its raw clay into burnt brick and tile are as follows:

(a) The clay is mined at several different pits simultaneously by draglines and loaded in dump cars which operate on railroad tracks and carry the clay to the plant.

(b) The clay is dumped from the cars into large feeders which mix the clay and reduce the large chunks to a size that can be carried on a conveyor belt.

(c) The clay mined from the several different pits is discharged from the feeders on conveyor belts which carry it first to a disintegrator or crusher and then to a storage shed, where it is blended and weathered.

(d) The clay blended and weathered in the storage shed is then loaded onto a conveyor belt which carries the clay to a set of smooth roll crushers, which further reduce the size of the chunks. In one of the plants there are two small additional granulators, or pug mills, through which the clay passes before reaching the smooth roll crushers.

(e) From these smooth roll crushers the clay is discharged onto another conveyor belt, which carries it by belt conveyors to another feeder where the clay is further blended or mixed.

(f) From the feeder the clay is discharged into the pug mill, which is a part of the brick machine wherein water is added as the final tempering process.

(g) From the pug mill the clay passes through a sealing die into and through a vacuum chamber where air is evacuated from the clay by a vacuum pump. The clay then falls into the extrusion section of the machine, where it is forced under pressure through various shapes of dies in long ribbons.

(h) The long ribbons of clay as extruded through the dies pass into the cutting machine, which cuts them into clay units of the desired size or length.

(i) The clay units as cut pass onto a conveyor belt and are then stacked by hand on dryer cars. These cars of brick are then moved to the dryer tunnels, were free water is evaporated from the clay units by warm air from fans which is blown on and over the units.

(j) When the free water is thus removed, the clay units are stacked either in periodic kilns, semi-continuous kilns, or continuous tunnel kilns.

(k) The clay units are then burned, either in periodic, semi-continuous or continuous tunnel kilns.

(l) The burnt brick and tile are then removed from the kilns.

(m) After they have been removed from the kilns, the burnt brick and tile are sorted and then loaded for shipment to purchasers.

It satisfactorily appears that these processes are the ordinary treatment processes by which brick and tile clay generally is extracted from the ground and processed into brick and tile, and that they are the processes normally employed by the brick and tile industry. These processes are not materially different from those of Cherokee Brick and Tile Company, but are basically and essentially the same processes. See Cherokee Brick & Tile Co. v. United States, supra.

Section 114(b) (4) (A) of the Internal Revenue Code of 1939, 26 U.S.C.A. § 114(b) (4) (A), provides that the allowance for depletion under Section 23 (m) in the case of brick and tile clay shall be five percentum of the gross income from the property during the taxable year. Section 114(b) (4) (B) contains the following definition of gross income from the property, to wit:

"As used in this paragraph the term 'gross income from the property' means the gross income from mining. The term 'mining' as used herein shall be considered to include not merely the extraction of the ores or minerals from the ground but also the ordinary treatment processes normally applied by mine owners or operators in order to obtain the commercially marketable mineral product or products * * *."

The same provision for depletion and the same definition of gross income from the property appear in section 613(b) (5) (A), Section 613(c) (1) and Section 613 (c) (2) of the Internal Revenue Code of 1954, 26 U.S.C.A. § 613(b) (5) (A), (c) (1, 2).

It appears that in the Cherokee case the defendant similarly contended that only processes (a) through (e) should be considered mining, and that the depletion allowance should be limited to 5% of the income attributable to those processes to the exclusion of the remaining processes. In deciding the question adversely to defendant's contention, the Circuit Court of Appeals held that, because of the clear and unambiguous language of the statute, gross income from mining must include the income from ordinary treatment processes which must be applied to obtain the commercially marketable mineral product and that the statute makes no provision for excluding any processes before such a marketable product is reached. United States v. Cherokee Brick & Tile Co., supra. See also Townsend v. Hitchcock Corporation, 4 Cir., 232 F.2d 444, affirming Hitchcock Corporation v. Townsend, D.C., 132 F. Supp. 785, which follows the Cherokee case and places a similar interpretation upon the statute with respect to the mining and processing of talc.

The Cherokee decision is applicable and controlling here. Consequently, the contention that certain of plaintiff's processes used in producing brick and tile should be excluded and disregarded in determining income from mining is without merit and must be decided against defendant.

Defendant argues further that there exists a market for plaintiff's raw clay and, consequently, the clay itself is plaintiff's first commercially marketable mineral product. In that connection, defendant refers to a report compiled from information on questionnaires supplied by producers of clay to the Bureau of Mines, United States Interior Department, which report is a part of the stipulation between the parties. The report indicates that some clay was sold in the United States during 1951, 1952 and 1953 for use in the manufacture of heavy clay products, i. e. building brick and tile, paving brick, drain tile, sewer pipe and kindred products. It is contended that, as a result, market conditions do prevail for brick and tile clay.

The stipulated report shows that of the total of 19,126,414 tons of clay sold or used for heavy clay products in 1951, 84,402 tons, or .44%, were sold; that of the total of 17,587,646 tons sold or used for such products in 1952, 230,295 tons, or 1.31%, were sold; and that of the total of 18,243,673 tons sold or used for those products in 1953, 342,506 tons, or 1.88%, were sold. Thus it appears that the quantity of clay sold each year is negligible in relation to the total.

In the Cherokee case [122 F.Supp. 61]. it did not appear that there was a complete absence of sales of brick and tile clay throughout the country, as will be seen from that part of the agreement between the parties, which states that "Only negligible amounts of the brick and tile clay mined in the United States can be sold before being processed into burnt brick and tile." It is true that the figures showing the quantities which had been sold did not appear in the record there, as they do here, since in that case the parties agreed that such sales were

negligible, while here the figures produced show them to be negligible. The Court does not consider that the Cherokee case can be distinguished on that account.

The amount of clay sold in this country for each year covered by the stipulated report was considerably less than the clay mined by plaintiff alone, and the record shows that in 1953 there were 579 brick and tile companies in the United States operating 723 plants. This Court is of the opinion that only negligible amounts of the brick and tile clay mined in the United States can be sold before being processed into burnt brick and tile, and the Court so holds.

The explanatory statement which follows and refers to Exhibit B of the stipulation containing the data on sales is significant. It states

"The data in row 1 (clay sold for heavy clay products) and rows 17–24 (sales by States) were obtained from confidential questionnaires and tabulations sheets in the Ceramics and Fertilizer Materials Branch files of the Bureau of Mines. The data cover those sales of miscellaneous clay which could be identified as used for heavy clay products and which were not considered to be transfers among different plants controlled by the one group. The data are not ordinarily published because they constitute such a small part of the total that it is not considered worth the effort to edit and compile them separately."

On the basis of the undisputed facts it must be concluded that plaintiff's brick and tile clay is not commercially marketable until it is processed into burnt brick or kindred products.

It seems clear to the Court that the processes in which plaintiff is engaged are included in "mining", as the term is used and defined in the Internal Revenue Code. It follows that plaintiff's depletion allowance should be computed on the selling price of plaintiff's burnt brick and tile, f. o. b. plant, loaded for ship-

ment, and that plaintiff is entitled to recover.   United States· v. Cherokee Brick & Tile Co., supra.

Judgment will be entered accordingly.