UNITED STATES of America,
Appellant,

v.

MERRY BROTHERS BRICK AND
TILE COMPANY, Appellee.

UNITED STATES of America,
Appellant,

v.

RELIANCE CLAY PRODUCTS COM-
PANY, Appellee.

Nos. 16373, 16323.

United States Court of Appeals
Fifth Circuit.

March 27, 1957.

No. 16373:

Gerard J. O'Brien, Atty., Dept. of Justice, Washington, D. C., Charles K. Rice, Asst. Atty. Gen., Dept. of Justice, Lee A. Jackson, Hilbert P. Zarky, Sheldon I. Fink, Attys., Dept. of Justice, Washington, D. C., William C. Calhoun, U. S. Atty., Augusta, Ga., for appellant.

Joseph B. Brennan, Atlanta, Ga., William M. Fulcher, Augusta, Ga., Fulcher, Fulcher, Hagler & Harper, Augusta, Ga., of counsel, for appellee.

No. 16323:

Gerard J. O'Brien, Sheldon I. Fink, Hilbert P. Zarky, Attys., Dept. of Justice, Washington, D. C., Charles K. Rice, Asst. Atty. Gen., John N. Stull, Acting Asst. Atty. Gen., Dept. of Justice, Robert N. Anderson, Atty., Dept. of Justice, Washington, D. C., John C. Ford, Asst. U. S. Atty., Dallas, Tex., Lee A. Jackson, Atty., Dept. of Justice, Washington, D. C., Heard L. Floore, U. S. Atty., Ft. Worth, Tex., for appellant.

Joseph B. Brennan, Atlanta, Ga., Lon Sailers, George S. Terry, Turner, Rodgers, Winn, Scurlock & Terry, Dallas, Tex., for appellee, Reliance Clay Products Co.

Before HUTCHESON, Chief Judge, and RIVES and BROWN, Circuit Judges.

HUTCHESON, Chief Judge.

These appeals from judgments of the United States District Court for the Southern and Northern Districts of Georgia [1] and Texas,[2] respectively, involve claims for refund of income and excess profits taxes. They present on the same basic facts the same basic question, and have therefore been submitted and argued together.

This question is whether this court will depart from its decision in United States v. Cherokee Brick & Tile Co., 5 Cir., 218 F.2d 424, in which, affirming the judgment and approving the opinion of the United States District Court for the Middle District of Georgia, in Cherokee Brick & Tile Co. v. United States, 122 F.Supp. 59, we said, 218 F.2d at pages 424–425 of the pertinent portion of Sec. 114 [3] of the Internal Revenue Code, 26 U.S.C.A. § 114(b) (4) (A, B):

> "The statutory language is clear and unambiguous, which is that gross income from mining must include the income from ordinary treatment processes which must be applied to the ore or mineral in order to obtain the commercially marketable mineral product, that is, the first product which is marketable in commerce. There is no provision in the statute for excluding any process before such a marketable product is reached. The only restriction is that the processes must be the ordinary treatment processes normally applied by mine owners or operators.

---

> "(B) Definition of gross income from property. As used in this paragraph the term 'gross income from the property' means the gross income from mining. The term 'mining' as used herein shall be considered to include not merely the extraction of the ores or minerals from the ground but also the ordinary treatment processes normally applied by mine owners or operators in order to obtain the commercially marketable mineral product or products, * * *"

---

1. Dated July 3, 1956, opinion reported 145 F.Supp. 186.

2. Dated May 14, 1956, no written opinion.

3. "(b) Basis for depletion
   * * * * *
   "(4) (A) The allowance for depletion under Sec. 23(m) in the case of the following mines and other natural deposits shall be—(i) in the case of * * * brick and tile clay * * * 5 per centum, * * * of the gross income from the property during the taxable year, * * *.

"The complaint alleges that, of the brick and tile clay mined in the United States, there is opportunity for the sale of only a negligible quantity before it is put into the form of burnt brick and tile. This allegation is admitted in the answer of the appellant. For this and other reasons (but mainly for this one) stated in the opinion of the district court, above cited, the judgment appealed from should be affirmed."

Conceding that the cases were decided below in accordance with our decision in the Cherokee case and that if that decision stands, they must be affirmed, the United States, stating: "Since this decision, the United States District Court of Maine, in Dragon Cement Co. v. United States, D.C., 144 F.Supp. 188", has, declining to follow the Cherokee decision, put forward an interpretation of its own of the statute, goes on to say:

"In view of this interpretation and the great number of decisions which have arisen within this circuit following the decision in Cherokee Brick & Tile Co., and which involve substantial amounts of revenue, the government respectfully asks this court to reconsider its decision."

Pointing out that, with the exception of that in the Dragon case, all of the numerous decisions in the district courts in this and other circuits and of the Courts of Appeals for, the Fourth Circuit, in Townsend v. The Hitchcock Corp., 232 F. 2d 444, 445, and the Tenth Circuit, in

United States v. Sapulpa Brick & Tile Co., 239 F.2d 694, have agreed with and approved our decision, appellees insist that the grounds now put forward in support of its reconsideration present no sound reasons therefor.

They urge upon us moreover that if we should enter upon such a reconsideration of the decision, the result would only be to reaffirm it, since the undisputed facts and every sound consideration of statutory construction and application support indeed compel the conclusion that it was right and should be adhered to.

■■ Upon the fullest and most careful re-examination and reconsideration of our decision in the Cherokee case, in the light of the records and the briefs and arguments in that case and these, we agree that this is so. Because it is and because in their decisions the district court and this court dealt adequately and correctly with the question presented in it and here, we will not undertake to restate or further elaborate upon the reasons they gave but will content ourselves with saying that, upon the plain and simple considerations set down and for the reasons pointed up in the Cherokee case, we decline to depart from the decision in it, and, on its authority, affirm the judgments appealed from.

■ We think it not amiss, however, to say that we have taken particular note of and approve the comment in appellee Reliance Clay Products Company's brief.[4] We have also taken particular note of and

4. "As one of the principal reasons for asking this Honorable Court to overrule the Cherokee case, the Government cites a District Court decision from the District of Maine, Dragon Cement Co. v. United States, 144 F.Supp. 188, a case involving cement rock. The Court there held that the cement which the taxpayer sold was not the 'commercially marketable mineral product' within the meaning of Section 114(b) (4) (B), although it was shown that only negligible quantities of cement rock could be sold before it was put in the form of cement.

"The Court reached this conclusion by a curious process of reasoning. It stated that cement is not a 'mineral product' within the statute, because chemical reactions in the kiln change the cement rock into a 'synthetic product'. The Court held that 'the emphasis must here be upon the word "mineral" as a noun', and that, therefore, a 'mineral product' is a product 'still in a mineral state.'

"The Court thus rewrote the statute to refer to the 'commercially marketable mineral', rather than the 'commercially marketable mineral product or products.' Furthermore, it ignored completely the fact that Congress intended Section 114 (b) (4) (B) to provide a simple marketable product rule to obtain the starting point for the computation of the percentage depletion deduction. The Court in

agree with Proposition No. 2 in Merry Brothers' brief, *"The government's attack on the Cherokee case is based on the fallacious assumption that the Cherokee decision allows depletion on 'manufacturing processes'"* (emphasis supplied), and its argument thereunder reproduced in part in the margin,[5] as well as its corollary *"that the Government's argument ignores the obvious fact that Congress intended Sec. 114(b) (4) to provide a*

*simple, practical rule which could easily be applied to compute the percentage depletion deduction"* (emphasis supplied) and its argument in support reproduced in part here:

" * * * we might also point out here that the Government's argument completely ignores the obvious fact that Congress intended Sec. 114(b) (4) to provide a simple, practical rule which could be easily

the Dragon Cement case recognized that, under its interpretation of 'mineral product', there never is a 'commercially marketable mineral product' obtained from cement rock. Thus the decision in the Dragon Cement case completely frustrates the purpose of Congress to provide the marketable product rule for computing the depletion deduction for all ores and minerals granted percentage depletion by Section 114(b) (4), including cement rock and brick and tile clay. * *

"The Court in the Dragon Cement case ignored the plain, obvious and generally understood meaning of 'mineral product' as will be shown below. It seized upon the word 'mineral' as the crucial word in the statutory phrase 'the commercially marketable mineral product or products.' That the word 'mineral' is not the crucial word in the statutory phrase is made clear by the Senate Finance Committee Report, quoted above, explaining the meaning of Sec. 114(b) (4) (B), which that Committee added to the Revenue Act of 1943:

" 'The purpose of the provision is to make certain that the ordinary treatment processes which a mine operator would normally apply to obtain a *marketable product* should be considered as a part of the mining operation. * * *' (emphasis supplied) Sen.Rep. 627, 78th Cong., 1st Sess. p. 23.

*Although the draft of the bill to which this Report referred contained the word 'mineral' and the phrase was worded exactly the same as it was in the final Act, the Committee did not even mention the word 'mineral' in explaining that the purpose of the provision is to enable the mine operator to obtain a 'marketable product.'"* (emphasis supplied)

5. "The Government's basic argument is not related to the language of the statute, but rests rather upon the theory or 'concept' of depletion which, the Government asserts, Congress had in mind when it granted the deduction. The Gov-

ernment argues, basically, that in the light of the theory of depletion it is unreasonable to suppose that Congress would have provided a deduction based on the gross income from the sale of 'manufactured' or 'finished' products such as brick and tile. The Government's brief undertakes to confuse the issue by giving the impression that the statute allows depletion on 'mining' or 'mining processes' and that this Court in the Cherokee case sustained a deduction for depletion not only on 'mining processes' but on 'manufacturing processes' or on a 'manufactured product'.

"Nothing could be further from the truth. Depletion is not allowed on any process, 'mining' or 'manufacturing', and is not allowed on any product. It is just as absurd to talk of allowing depletion 'on' the first 'mining' process of extracting clay from the ground, as it is to talk of allowing depletion 'on' the last 'manufacturing' process of burning the clay in the kiln. On the contrary, depletion is allowed to compensate the mine owner for exhaustion of his natural deposit. But instead of limiting the depletion deduction to a recovery of the cost of the natural deposit, Congress has chosen to allow the deduction to be computed as a stated percentage of the selling price of the 'commercially marketable mineral product', the selling price of the mineral product for which a commercial market exists. It has done so by defining 'gross income from the property' in Sec. 114(b) (4) (B) to include not only the income derived from the extraction process but also the income from processes applied to the ore or mineral, after extraction from the natural deposit, to obtain the commercially marketable mineral product. But in no sense does this mean that depletion is allowed 'on' any of the processes or 'on' the products produced thereby, or that such processes or products are 'depleted'. We feel that this simple analysis disposes of the Government's whole argument."

.applied to compute the percentage depletion deduction.

"In order to compute a percentage depletion deduction, there must be a dollar base to which to apply the applicable percentage. Congress elected to use the marketable product rule as a simple means to provide this dollar base. With this dollar base established in Subparagraph (B) of Section 114(b) (4), Congress can then set the applicable rates in Subparagraph (A) to produce the dollar amount of depletion which it wishes to grant in the case of each particular type of natural deposit without disturbing the simple means for determining the dollar base. Of course, the processing necessary to obtain marketable products from the ores and minerals mined from the various types of natural deposits will vary greatly, but this fact can be taken into account in fixing the applicable rates. Thus, Congress has set rates in Sec. 114(b) (4) (A) which vary from 5% to 23%, and these rates can be raised or lowered as Congress sees fit.

"* * * If Congress upon further consideration should feel that applying the applicable rate to the gross income from any product, whether or not it is a 'manufactured' product produces too large a depletion deduction, and should wish to decrease that deduction, it has only to lower the rate while still using as a base the gross income from the marketable product.

"In spite of its effort to conceal the fact, the Government's argument in sum and substance is merely that 5% of the selling price of burnt brick and tile is too large a deduction to allow the mine owner as compensation for that part of the brick and tile clay deposit consumed in producing that brick and tile. However, the amount of the deduction to be allowed to the miners of brick and tile clay is a matter exclusively for Congress. The Government,

therefore, recognizing that it cannot ask this court to change the rate of 5% specified in the statute for brick and tile clay, seeks instead to have this court rewrite the statute by changing the dollar base to which the rate is applied, as the court did in the Dragon Cement case."

The judgments are affirmed.