**HENDERSON CLAY PRODUCTS,**
Plaintiff,

v.

**UNITED STATES of America,**
Defendant.

Civ. A. No. 2463.

United States District Court
E. D. Texas,
Tyler Division.

Sept. 6, 1961.

B. L. Bird, Fort Worth, Tex., Robert B. Wallace, Corpus Christi, Tex., Charles W. Shaw, Henderson, Tex., for plaintiff.

Joe Tunnell, U. S. Atty., Lloyd W. Perkins, Asst. U. S. Atty., Tyler, Tex., William A. Miner, Washington, D. C., for defendant.

SHEEHY, Chief Judge.

Plaintiff instituted this suit on January 27, 1958, seeking a refund of income and excess profits taxes, together with interest thereon, assessed against it by the Commissioner of Internal Revenue, hereinafter referred to as Commissioner. The facts as admitted by the parties and as found by the Court as well as the contentions of the parties are as hereinafter stated.

Plaintiff is a Texas corporation, with its principal office in Henderson, Texas, within this district and division. It owns clay pits and deposits located near Henderson, Texas, and is engaged in the business of mining the clay from said clay pits and manufacturing said clay so mined into brick which it sells throughout the United States. Plaintiff keeps its books on a basis of a fiscal year ending March 31 and uses the accrual system of accounting.

Within the time precribed by law it filed its income tax returns for the fiscal years ending March 31, 1951, 1952, 1953 and 1954 with the Commissioner. In such returns it took deductions for percentage depletion on the clay it mined from its pits and manufactured into brick. Thereafter such returns were examined by an agent of the Internal Revenue Department who adjusted the deductions for percentage clay depletion and found and determined deficiencies in income and excess profits taxes, which deficiencies, with accrued interest thereon, Plaintiff thereafter paid. The Commissioner found that Plaintiff's clay qualified as ball clay and allowed depletion at the statutory rates specified for ball clay by using the proportionate profits method of determining the gross income from mining provided for by Treasury Regulations 118, § 39.23(m)–1. The total tax paid by Plaintiff for the year ending March 31, 1951, was the sum of $81,-612.73. The total tax and interest paid by Plaintiff for the year ending March 31, 1952, was the sum of $93,101.45. The total tax and interest paid by Plaintiff for the year ending March 31, 1953, was the sum of $58,897.68. The total tax and interest paid by Plaintiff for the year ending March 31, 1954, was the sum of $95,361.49. Thereafter Plaintiff filed claims for refunds of income taxes and excess profits taxes paid by it for said four years, said claims having been filed and having been rejected as follows: the claim for the fiscal year ending March 31, 1951, was filed on June 29, 1955, and re-

jected by the Commissioner on April 13, 1955; the claim for the fiscal year ending March 31, 1952, was filed on June 13, 1955, and was rejected by the Commissioner on April 13, 1956; the claim for the fiscal year ending March 31, 1953, was filed on June 13, 1956, and was rejected by the Commissioner on April 1, 1957; the claim for the fiscal year ending March 31, 1954, was filed on June 14, 1957, and was rejected by the Commissioner on November 13, 1957.

Each of the claims for refund, referred to in the paragraph next above, (1) stated that Plaintiff was the owner of clay deposits from which the clay was taken and made into brick and that the clay was ball clay; (2) referred to and incorporated in such claim Plaintiff's income tax return for the year in question and the Internal Revenue Agent's report applicable to such return; (3) stated that Plaintiff claims that the depletion allowed by such Revenue Agent's report from the mining of ball clay was erroneous; (4) averred that Plaintiff was entitled to depletion on the clay extracted at the rate prescribed for ball clay (15%) as provided by § 114(b) (4) (A) (iii), I.R.C. 1939, 26 U.S.C.A. § 114(b) (4) (A) (iii); (5) stated that the depletion allowance allowed Plaintiff should have been based on the gross income from mining and quoted the § 114(b) (4) (B) definition of gross income from the property and from mining; (6) stated the first commercially marketable mineral product obtained from its mining of ball clay was finished burnt brick and that all processes requisite to producing the burnt brick were ordinary treatment processes of mining as defined by the Code; and (7) claimed a refund of income and excess profits taxes in specific amounts or such greater amounts as might be due with interest thereon as provided by law. The explanation given in the Revenue Agent's reports recommending disallowance and rejection of such claims was that the Internal Revenue Agent had allowed the depletion computed on the proportionate profits method of determining the gross income from the property and that the Commissioner had not acquiesced in the computation of depletion on the sales price of brick.

In its original complaint the Plaintiff alleged and contended that it sold no clay at any stage prior to the finished brick product; that it had no commercial market for such clay prior to the time it was in the finished brick stage; that such finished burnt brick was Plaintiff's only commercially marketable mineral product; that no commercial market existed in the area of Plaintiff's clay pits for clay in the quantities mined by the Plaintiff other than in the finished burnt brick state; and that it was entitled to a depletion allowance of 15% of the gross income from the sale of its burnt brick not to exceed 50% of the net income from the sale of its brick. In June 1958 one of Plaintiff's attorneys discussed this case with the attorneys in the Department of Justice who were in charge of the case and agreed that the case should be settled. Following that discussion and at a time when this case was set for trial for July 14, 1958, the parties hereto filed on July 3, 1958, a joint motion for continuance. Among other statements made in said motion were the following:

"That Plaintiff and Defendant have agreed on all issues of fact and the law of the case except as to one point, and that point is as to whether or not ball clay has any substantial market value in the area of the Plaintiff's operation for other purposes other than the making of brick. That both Plaintiff and Defendant are making their investigation at this time as to such question, and it is the opinion of the Attorneys, both Plaintiff and Defendant, that said cause can be settled without the necessity of further litigation if said cause is continued."

That motion was granted on July 7, 1958. Thereafter the case was reset for trial for September 2, 1958. On August 25, 1958, the parties filed another joint motion for continuance requesting that the case be removed from the settings for September 2, 1958, in order that the par-

ties might be given a further opportunity to settle the case. That motion was granted on August 26, 1958.

By letter dated September 12, 1958, Plaintiff's attorney submitted to the Justice Department its offer of settlement which was that Defendant make refunds to the Plaintiff in the amounts claimed in the original complaint. In said letter the Plaintiff, after pointing out the fact that ball clay substantially the same as Plaintiff's ball clay was at the stage it was ready for Plaintiff's pug mill was during the tax years in question mined in the Tennessee-Kentucky area and sold, after undergoing processes substantially the same as used by Plaintiff up to the point its clay was ready for the pug mill, as shredded clay or air-floated clay and that there was a national market for such shredded and air-floated ball clay, stated:

"Consequently, if it be said that on the national market Henderson's first commercially marketable mineral product was unprocessed ball clay it would follow that the prevailing prices for such clay should be used in determining Henderson's depletion deductions; if so, Henderson would be entitled to greater depletion deductions than it now claims—without regard to whether the average prices ($15.50 per ton) resulting from our investigation or the Year Book averages ($10.80 to $12.70) be used."

By letter dated September 27, 1958, addressed to Plaintiff's attorney, the Justice Department acknowledged receipt of Plaintiff's attorney's letter of September 12, 1958, and advised that the Justice Department would obtain the views of the Chief Counsel, Internal Revenue Service, and final action would be taken by or on behalf of the Attorney General.

In October 1958, pursuant to an agreement between the Justice Department and Plaintiff's attorney, an Internal Revenue agent discussed with Plaintiff's counsel the facts stated in Plaintiff's attorney's letter of September 12, 1958, and went to Plaintiff's plant and made inquiry about Plaintiff's clay and made further investigation. Sometime prior to April 16, 1959, this case was again set for trial for May 4, 1959. In a letter dated April 16, 1959, addressed to Plaintiff's attorney, the Justice Department stated, among other things, as follows:

"We have just recently received the results of a supplemental investigation conducted by the Internal Revenue Service and final action with respect to your offer by or on behalf of the Attorney General has not been taken.

"Accordingly, we would appreciate having this case continued generally pending a consideration of your offer by this office. A copy of this letter is being sent to the United States Attorney."

On April 22, 1959, the Defendant filed a motion asking that this cause be again continued because an offer of compromise was then under consideration and attached thereto a letter dated April 17, 1959, written by Plaintiff's attorney to the United States Attorney for this district wherein Plaintiff's attorney, in effect, agreed to a continuance of the case in order that further consideration could be given to Plaintiff's offer of settlement. The last mentioned motion for continuance was granted on April 23, 1959. Thereafter and sometime prior to August 14, 1959, the case was reset for trial for October 12, 1959. On August 14, 1959, Plaintiff's attorney addressed a letter to the Department of Justice requesting that he be advised as to Plaintiff's offer of settlement made in his letter of September 12, 1958. On September 15, 1959, the parties filed another joint motion for continuance stating in said motion that it was believed that if additional time were given, the parties would possibly settle the case. That motion for continuance was granted September 16, 1959. Thereafter the case was again set for trial for January 18, 1960. On December 24, 1959, the Defendant filed another motion for continuance of this cause, and that motion stated in part as follows:

"1. On December 14, 1959, the Supreme Court granted the Govern-

ment's petition for certiorari in United States v. Cannelton Sewer Pipe Co. (S.D.Ind.) decided June 25, 1958, (2 A.F.T.R.2d 5277), affirmed, 268 F.2d 334 (C.A. 7th), which case involves issues substantially identical to the issues in this case; that is, what is the first commercially marketable mineral product of a particular mineral deposit within the meaning of the applicable statute.

"2. A decision by the Supreme Court in the Cannelton case in all likelihood would be dispositive of the same issues involved in this case."

That motion was granted on December 30, 1959. On January 2, 1960, the Plaintiff filed a motion to set aside the order granting Defendant's last mentioned motion for continuance. A hearing was had on said motion, and on January 8, 1960, said motion was denied. No further settings of the case for trial were made until subsequent to the decision of the Supreme Court in United States v. Cannelton Sewer Pipe Co., 364 U.S. 76, 80 S.Ct. 1581, 4 L.Ed.2d 1581. In the decision handed down on June 27, 1960, the court in that case held that the depletion allowance granted by the Revenue Code to miners for certain minerals, including clay, was to be based on a constructive income from the mineral, i. e., the value of the mineral at the point where ordinary non-integrated miners disposed of their product and not on the value of the finished article manufactured from said minerals. On December 7, 1960, the Plaintiff filed a motion for leave to file an amendment to its original complaint and stated in said motion that in view of the decision of the Supreme Court in the Cannelton case, supra, Plaintiff desired to add a count to its complaint alleging the facts which under the Cannelton case Plaintiff believed required a judgment in its favor. The proposed complaint was in two counts. Count A was an adoption of the original complaint. In Count B, the added count, Plaintiff alleged, in effect, that during the tax years in question there was a market for shredded and air-

floated ball clay identical with or substantially the same as its ball clay, and that said market averaged $10.50 per ton for shredded clay and $20.50 per ton for air-floated clay; that the shredded and/or air-floated ball clay was the first commercially marketable mineral product obtained by the ordinary treatment processes applied by mine owners to ball clay; that in the process of mining its clay and manufacturing brick it, by the use of the ordinary treatment processes normally applied by mine owners in order to obtain shredded clay and/or air-floated clay, produced shredded ball clay; and that because of such facts, it, if it were not entitled to recover on the basis set forth in Count A of its complaint, was entitled to a refund of income and excess profits taxes determined by using as its depletion allowance 15% of the product of the number of tons produced by it times the value of the shredded ball clay and/or air-floated clay. The Defendant made no objection to the filing of said amendment to the complaint. An order was entered on December 20, 1960, granting Plaintiff leave to file said amended complaint and on that date said amendment was filed. On January 16, 1961, Plaintiff filed its amended answer in answer to Plaintiff's amended complaint but did not allege as an affirmative defense or otherwise that the basis for Plaintiff's claim for refund as set forth in Count B of its amended complaint did not come within the scope of the claims for tax refunds that the Plaintiff filed with the Commissioner.

In February 1961 an employee of the Internal Revenue Service again visited Plaintiff's plant, observed Plaintiff's mining and manufacturing operations, took samples of Plaintiff's clay and discussed with Plaintiff's representatives Plaintiff's mining and manufacturing processes, etc. During the latter part of March 1961 and after this case had been set for trial for April 4, 1961, Defendant, pursuant to notice of intention to take depositions previously filed on March 17, 1961, took the depositions, by oral examination, of five ball clay miners

in the Tennessee-Kentucky area where substantial quantities of ball clay are mined and developed from said witnesses facts relating to the character of ball clay mined, the methods of mining and treatment processes normally applied by such miners, the commercially marketable mineral products of said ball clay and the prices received by such miners for ball clay during the tax years in question. Each of said depositions was offered in evidence at the trial.

This case was called for trial on April 4, 1961. After both the Plaintiff and Defendant announced ready for trial, the Defendant, without previous notice to either the Court or to the Plaintiff, filed and presented its motion to dismiss Count B of the amended complaint on the ground that the basis for recovery set forth in said Count B did not come within the scope of the claims filed by Plaintiff with the Commissioner. This was the first time that the Defendant had made such an assertion or contention. The Court reserved action on said motion to dismiss and carried it along with the case. Although the factual basis for Count B was set forth, in effect, in Plaintiff's offer of settlement contained in its letter of September 12, 1958, above referred to, and the Commissioner had such facts before him and investigated them for some two and one-half years prior to April 4, 1961, the date the case went to trial, the record fails to show that the Commissioner ever formally rejected Plaintiff's offer of settlement. However, it must be assumed that the Commissioner acted upon said offer of settlement and decided not to accept said offer sometime prior to Defendant announcing ready for trial even though such decision on the part of the Commissioner was not communicated to Plaintiff.

Section 23 of the Internal Revenue Code of 1939, 26 U.S.C.A. § 23 provides for a deduction from gross income of a depletion allowance on minerals. Section 114(b) (4) (A) authorizes a depletion allowance in the case of ball clay at 15% of the gross income from the property and provides such depletion allowance shall not exceed 50% of the net income of the taxpayer from the property. Section 114(b) (4) (B) defines "gross income from the property" as the "gross income from mining" and "mining" is defined to include not only extraction of a mineral from the ground but also "the ordinary treatment processes normally applied by mine owners or operators in order to obtain the commercially marketable mineral * * * products, and so much of the transportation of ores or minerals (whether or not by common carrier) from the point of extraction from the ground to the plants or mills in which the ordinary * * * processes are applied thereto." This section further provides that "ordinary treatment processes" in the case of ball clay shall include "sorting, concentrating, and sintering to bring to shipping grade and form, and loading for shipment." When the identity of the depletable product—the commercially marketable mineral product—is determined, the next step is to compute the taxpayer's "gross income" from that product. The Treasury Regulations have long made provisions for certain methods to be used in making that computation. Treasury Regulation 118, Section 39.23(m)–1 provides in part as follows:

"(3) If the taxpayer sells the crude mineral product of the property in the immediate vicinity of the mine, "gross income from the property" means the amount for which such product was sold, but, if the product is transported or processed (other than by the ordinary treatment processes described below) before sale, "gross income from the property" means the representative market or field price (as of the date of sale) of a mineral product of like kind and grade as beneficiated by the ordinary treatment processes actually applied before transportation of such product (other than transportation treated, for the taxable year, as mining). If there is no such representative market or field price (as of the date of sale), then there shall be

used in lieu thereof the representative market or field price of the first marketable product resulting from any process or processes (or, if the product in its crude mineral state is merely transported, the price for which sold) minus the costs and proportionate profits attributable to the transportation (other than transportation treated, for the taxable year, as mining) and the processes beyond the ordinary treatment processes."

The method to be used in computing "gross income from the property" when there is no representative or field price for the mineral product, as provided for by the regulation just quoted, is commonly referred to as the "proportionate profits method." Such method is a computation by which the sales price (covering both costs and profit) of what the taxpayer actually is allocated to mining (the depletable form of the mineral), and separated from manufacturing and other specialized operations, in proportion to the costs attributable to mining.

During the tax years in question Plaintiff was an integrated miner-manufacturer. It owned clay deposits which it mined and manufactured into brick which it sold on the market throughout the United States. It did not sell any of its clay except in the form of bricks. The clay it mined and manufactured into bricks was ball clay. During the tax years in question it mined and made into brick which it sold the following amounts of its ball clay: for the year ending March 31, 1951—53,540.2 tons; for the year ending March 31, 1952—51,755.9 tons; for the year ending March 31, 1953—53,699.3 tons; and for the year ending March 31, 1954—55,387.7 tons.

In mining its clay Plaintiff used the strip mining method. It removed the overburden down to the clay. The clay was then removed by the use of a dragline and loaded into trucks which transported the clay approximately four miles to Plaintiff's plant. As removed from the pit or mine by the dragline, the clay was in large balls or lumps weighing up to 200 pounds. Upon the clay reaching Plaintiff's plant, Plaintiff by the use of a shredder or some other method disintegrated or shredded the clay down to a small manageable size. Upon that being done, the clay was either placed in Plaintiff's pug mill or stored for later use in the pug mill. When the clay was put into the pug mill, certain blending and screening was done and water was added so that it was reduced to malleable form and formed into the shape of brick. From the pug mill the clay in the shape of brick went to dryers, and from the dryers it went to the kiln for burning and oxidation. The clay came out of the kiln in the form of finished brick and was either loaded for shipment or stored for later shipment.

Approximately 90% of the ball clay mined in the United States is mined in the Tennessee-Kentucky area. During the tax years in question there were a number of persons or firms engaged as non-integrated miners in the mining and selling of ball clay in that area. Like the Plaintiff, those miners used the strip mining method. They first removed the overburden from the ball clay deposit. The ball clay was then removed in large balls or lumps by the use of a dragline or a similar method and loaded into trucks which transported the clay to the mine operator's plant. Upon reaching the plant, the clay was disintegrated by the use of machinery to a small size—about the size of a walnut—which is commonly referred to as shredded clay. The shredded clay was then either loaded for shipment or stored for later sale and shipment or further reduced to a pulverized—almost powder—size. The clay reduced to the pulverized size was commonly referred to as air-floated clay. The clay miners of the Tennessee-Kentucky area sold shredded ball clay and air-floated ball clay all over the United States. During the tax years in question there was a market for shredded ball clay and air-floated clay all over the United States, and the average market value of shredded ball clay during each of those years was the sum of $10.50 per ton. Therefore, I

find that the first commercially marketable product obtained from ball clay is shredded ball clay, and that the processes applied by the miners of ball clay in the Tennessee-Kentucky area to obtain said shredded ball clay are those that must be normally applied by mine owners or operators in order to obtain shredded ball clay. The processes used by Plaintiff in mining and handling its ball clay up to the time said clay is put in its pug mill are substantially the same as the processes applied by ball clay miners in the Tennessee-Kentucky area in obtaining shredded ball clay. Plaintiff's ball clay in the condition it was in at the time it was put in Plaintiff's pug mill was the same or substantially the same as the shredded ball clay marketed by the ball clay miners in the Tennessee-Kentucky area. Thus I find and conclude that the first commercially marketable product Plaintiff obtained in the mining of its ball clay was its clay in the condition it was in at the time it was ready to be placed in Plaintiff's pug mill, i. e., shredded ball clay, and that the processes used by Plaintiff in obtaining said shredded ball clay were the ordinary treatment processes normally applied by owners or operators of ball clay mines in order to obtain shredded ball clay. I further find that during each of the years in question Plaintiff's ball clay in the condition it was in at the time it was placed in Plaintiff's pug mill had an average market value or value of $10.50 per ton.

As above indicated, when the Commissioner examined Plaintiff's tax returns for the years in question, he used the proportionate profits method to determine the depletion allowance Plaintiff was entitled to for its clay and adjusted such depletion allowances so as to allow for depletion the sum of $22,395.61 for the year ending March 31, 1951; the sum of $21,340.50 for the year ending March 31, 1952; the sum of $15,440.80 for the year ending March 31, 1953; and the sum of $20,798.19 for the year ending March 31, 1954. The Commissioner's action in allowing depletion in only those amounts resulted in the deficiencies being assessed against the Plaintiff as hereinabove referred to. In applying such method the Commissioner determined that Plaintiff's mineral product was its clay at the point it was ready to go into Plaintiff's pug mill and all processes applied by the Plaintiff thereafter were manufacturing processes and were not ordinary treatment processes normally applied by mine owners or operators. It must be presumed that the Commissioner found that there was no market for Plaintiff's clay at the stage it was ready to go into Plaintiff's pug mill because the Treasury Regulation permitting use of the proportionate profits method, above referred to, permits the use of such method only when there is no market for the mineral product.[1]

The Plaintiff asserts that the Commissioner was in error in finding that there was no market for its mineral product, and that the Commissioner was in error in using the proportionate profits method. In this connection the Plaintiff contends (1) that the first commercially marketable product obtained by it from its ball clay was the finished brick and that under the holdings in such cases as United States v. Cherokee Brick and Tile, Co. (5th Cir.) 218 F.2d 424 and United States v. Merry Brothers Brick and Tile Co. (5th Cir.) 242 F.2d 708, its gross income from the property for depletion purposes or its depletion base was the sales price of its brick or (2) that if there were a market for its clay at the stage where said clay was ready to go into Plaintiff's pug mill, its gross income from the property or its depletion base for the purposes of depletion, under the holding in the Cannelton case, supra, should be the value per ton of said clay at the stage it was ready to go into Plaintiff's pug mill times the number of tons of such clay mined and processed during the tax year. A depletion base which is the product of the number of tons of ball clay mined and processed during the tax year in question times the value per ton for said clay at the point it was ready to go into Plain-

---

1. Alabama By-Products Corp. v. Patterson (5th Cir.) 258 F.2d 892, 900.

tiff's pug mill, i. e., shredded clay, would be somewhat greater than a depletion base for each of the years in question that was based on the sales price of Plaintiff's brick during the tax year.

■ Under the findings above made to the effect that Plaintiff's first commercially marketable product obtained in the mining of its ball clay was shredded ball clay, i. e., clay in the condition it was in at the time it was ready to be placed in Plaintiff's pug mill; that Plaintiff's said shredded ball clay had a value of $10.50 per ton during each of the years in question and that the processes used in obtaining said shredded ball clay were the ordinary treatment processed normally applied by owners or operators of ball clay mines in order to obtain shredded ball clay, and, under the teachings of Cannelton, the sales price of Plaintiff's brick during the tax year was not its depletion base. However, under such findings and the teachings of Cannelton, Plaintiff's depletion base or gross income from its property during each of the tax years in question was the product of the number of tons of ball clay mined and processed by Plaintiff during the tax year times the value per ton ($10.50) of said clay at the stage it was ready to be placed in Plaintiff's pug mill.

Applying the 15% statutory depletion allowance for ball clay to the product of the number of tons of ball clay mined and processed by Plaintiff during each of the tax years in question, as above found, times $10.50, it follows that Plaintiff was entitled to depletion allowance for each of the tax years in question as follows: for the year ending March 31, 1951, the sum of $84,325.82; for the year ending March 31, 1952, the sum of $81,515.54; for the year ending March 31, 1953, the sum of $84,576.40; and for the year ending March 31, 1954, the sum of $87,235.63. In each instance the depletion allowance just mentioned was less than 50% of the net income of the Plaintiff from its property for the tax year.

Therefore, Plaintiff is entitled to recover from Defendant the difference in the amount of taxes Plaintiff paid for each of the years in question and the amount those taxes would have been had Plaintiff been allowed for each of said years the depletion allowance it was entitled to as just found, with interest as provided by law on the overpayments of taxes made by Plaintiff, unless Defendant's contention made in its motion to dismiss Count B of Plaintiff's amended complaint is correct.

Section 7422 of the Internal Revenue Code of 1954, 26 U.S.C.A. § 7422 provides, in effect, that no suit shall be maintained for the recovery of any internal revenue tax alleged to have been erroneously or illegally assessed or collected until a claim for refund has been filed with the Secretary of the Treasury or his delegate, according to the provisions of law in that respect, and the regulations of the Secretary of the Treasury or his delegate established in pursuance thereof.[2] The pertinent Treasury regulation provides that a claim for a tax refund must be made on Form 843 and further provides that the claim must set forth in detail each ground upon which the refund is claimed and facts sufficient to apprise the Commissioner of the exact basis thereof.[3] Defendant, in its motion to dismiss Count B of Plaintiff's amended complaint, contends that the grounds set forth by Plaintiff in said count were not asserted in its claims for refund filed with the Commissioner as required by the statute and regulation, above referred to, and because said grounds were not asserted in the claims filed before the Commissioner said grounds cannot be asserted as a basis for a recovery in this action.

■■ It is well established that the timely filing of a claim for refund with the Commissioner is a statutory prerequisite to recover taxes alleged to have been illegally assessed and collected. United States v. Felt & Tarrant Co., 283 U.S.

2. Section 3772 of the Internal Revenue Code of 1939, 26 U.S.C.A. § 3772 made like provisions.

3. Treasury Regulations 301.6402–2.

269, 51 S.Ct. 376, 75 L.Ed. 1025; Carmack v. Scofield (5th Cir.) 201 F.2d 360; and Snead v. Elmore (5th Cir.) 59 F.2d 312. The authorities just cited likewise stand for the proposition that, under a regulation requiring that a claim set forth each ground upon which the refund is claimed, a taxpayer cannot in its claim filed with the Commissioner assert one ground and in a suit to recover for taxes allegedly illegally assessed assert an entirely different ground. However, the Commissioner can waive the requirements of the regulation requiring that each ground relied upon by the taxpayer be asserted in the claim filed with the Commissioner and thus permit a taxpayer to assert in a suit to recover taxes a ground that he did not assert in his claim filed with the Commissioner. Angelus Milling Co. v. Commissioner, 325 U.S. 293, 65 S.Ct. 1162, 89 L.Ed. 1619; Tucker v. Alexander, 275 U.S. 228, 48 S.Ct. 45, 72 L.Ed. 253; Sunland Industries v. United States (9th Cir.) 248 F.2d 768; and Samara v. United States (2d Cir.) 129 F.2d 594 (Writ of Certiorari denied, 317 U.S. 686, 63 S.Ct. 258, 87 L.Ed. 549). As stated by the Supreme Court in the Angelus Milling Company case, supra, "Even tax administration does not as a matter of principle preclude considerations of fairness." [325 U.S. 293, 65 S.Ct. 1165.]

After a careful consideration of Plaintiff's claims for refund filed with the Commissioner, I find and conclude that said claims comprehended, embraced and included the issues tendered by Count B of its amended complaint. Even if it should be determined that the issues tendered by Count B of the amended complaint were not embraced and included in the claims for refund filed by the Plaintiff. I find and conclude that the Commissioner, under the facts in this case as above found, waived the provisions of the regulation requiring the assertion of the grounds forming the basis of Count B in the claims for refund. Therefore, Defendant's motion to dismiss Count B of Plaintiff's complaint is without merit and will be overruled.

During the trial the parties agreed that if the Court concluded that the Plaintiff was entitled to recover and determined the depletion allowance that Plaintiff was entitled to for each of the tax years in question, the parties, upon being apprised of such conclusion and determination, would attempt to stipulate the amount of the recovery Plaintiff is entitled to without admitting the correctness of the Court's conclusions and determinations as to the amount of depletion the Plaintiff is entitled to for each of the tax years in question. In view of that agreement, the parties will be given thirty days from the date of this Memorandum Decision within which to prepare and file as a part of the record in this case a stipulation as to the amount Plaintiff is entitled to recover in light of the findings and conclusions herein made. Upon such a stipulation being filed, the attorneys for the Plaintiff should present an appropriate form of judgment allowing Plaintiff a recovery in the amount set forth in the stipulation. In the event the parties are unable to reach an agreement as to the amount of recovery Plaintiff is entitled to within the thirty-day period, the Court, upon being so advised by the parties, or either of them, will order a hearing for the purpose of determining the amount of the recovery.

As authorized by Rule 52, F.R.Civ.P., 28 U.S.C.A., this Memorandum Decision, together with the stipulation, if any, made by the parties and filed herein as to the amount of recovery Plaintiff is entitled to under the findings and conclusions herein made or in the absence of such a stipulation the findings made by the Court, after hearing, as to the amount Plaintiff is entitled to recover, will constitute the Findings of Fact and Conclusions of Law herein.