MONOLITH PORTLAND CEMENT COMPANY, a corporation, Appellant,

v.

UNITED STATES of America, Appellee.

UNITED STATES of America, Appellant,

v.

MONOLITH PORTLAND CEMENT COMPANY, a corporation, Appellee.

No. 16063.

United States Court of Appeals
Ninth Circuit.

July 2, 1959.

Enright, Elliott & Betz, Joseph T. Enright, Norman Elliott, Bill B. Betz, Los Angeles, Cal., for appellant.

Howard A. Heffron, Acting Asst. Atty. Gen., James P. Turner, Melva M. Graney, Lee A. Jackson, Attys., Dept. of Justice, Washington, D. C., Laughlin E. Waters, U. S. Atty., Edward R. McHale, Asst. U. S. Atty., Los Angeles, Cal., for appellee.

Before CHAMBERS, HAMLEY and JERTBERG, Circuit Judges.

HAMLEY, Circuit Judge.

Monolith Portland Cement Company brought this action against the United States seeking a refund of a portion of its federal income taxes paid for 1951. The theory of the action is that the company in preparing its 1951 return understated the depletion allowance which it was entitled to deduct from the gross income derived from a limestone quarry. Recovery in the sum of $264,435.41 was sought. After a trial a judgment in that amount was entered.

Although it obtained judgment in the amount prayed for, Monolith appeals because of its dissatisfaction with certain findings of fact and conclusions of law. The company asserts that it is aggrieved because of the findings and conclusions to the effect that its limestone is "calcium carbonate" rather than "chemical grade limestone," as those terms are used in § 114(b) (4) (A) of the Internal Revenue Code of 1939, as amended, 26 U.S. C.A. § 114(b) (4) (A).

The Government has cross-appealed. It contends that the district court erred in holding that the gross income attributable to the mineral materials which Monolith adds to its limestone in producing cement should be included in computing the depletion allowance.

During the year 1951, Monolith operated a limestone quarry and cement plant at Monolith, California. In addition to mining limestone it also mined other raw materials which it used in making cement. These additional materials were clay No. 1, clay No. 2, tufa, and gypsum. In addition the company purchased for use in its operations stipulated quantities of iron cinders and fluorspar. Applying customary methods used in the cement industry, these raw materials were blended and processed into Portland cement.

The process employed by the taxpayer in arriving at the finished product of Portland cement may be summarized as follows: The calcium carbonate rock was obtained from the face of the quarry by the open pit method, and further broken into manageable size by secondary or squib blasting. The rock was then taken by rail to a large primary crusher which reduced the size of the rock to pieces with a maximum diameter of about six inches. After secondary crushing the rock was transported to the cement plant and placed either in a limestone hopper or in a pile used to replenish the hopper.

The limestone was then blended with clay No. 1, clay No. 2, and iron cinders. Measuring and conveying equipment was used to accomplish this blending. The blended materials were then gravity-fed into a ball mill where, with the addition of water, they were ground to a proper fineness known as "slurry." The slurry, after further grinding in tube mills, was conveyed to a wet slurry tank where it was kept in suspension and blended by a revolving paddle mechanism and, after blending, fed into a kiln.

The kiln-fed slurry was run into the upper end of rotary kilns, which were in the form of long rotating cylinders set at a slight inclination. The slurry traveled gradually toward the lower end. Hot gases from a flame at the lower end evaporated the water from the slurry, and the application of heat at a proper temperature chemically combined the remaining material into a dense "clinker." The clinker was conveyed to a grinding mill where gypsum was added. This mixture was then ground to a great fineness to become one of the various types of Portland cement. It does not appear in the record at what point the tufa and fluorspar were added.

Section 23(m) of the Internal Revenue Code of 1939, 26 U.S.C.A. § 23(m), allows a deduction for depletion in the computation of net income. Section 23(n) provides that the basis for such depletion "shall be as provided in section 114." Section 114(b) (4) (A) (ii) provides that in the case of "calcium carbonates" the allowance shall be ten per cent of the gross income from the property during the taxable year. Section 114(b) (4) (A) (iii) provides that in the case of "chemical grade limestone" the allowance shall be fifteen per cent of the gross income from the property during the taxable year. Section 114(b) (4) (A) provides that such allowances shall not exceed fifty per cent of the net income of the taxpayer (computed without allowance for depletion) from the property, with an exception not here applicable.

Subparagraph (b) (4) (B) of the same section defines "gross income from the property" to mean "gross income from mining" and then defines "mining" as, follows:

"The term 'mining' as used herein shall be considered to include not merely the extraction of the ores or minerals from the ground but also the ordinary treatment processes normally applied by mine owners or operators in order to obtain the commercially marketable mineral product or products. * * *"

In its tax return for 1951, Monolith considered its commercially marketable product from the mining of limestone to be limestone in the form of slurry. It considered the limestone to be "calcium carbonates," entitled to a ten per cent depletion allowance, rather than "chemical grade limestone," entitled to a fifteen per cent allowance.

Premised on these determinations, the depletion allowance would have been $271,045.01, or ten per cent of the gross sales of limestone less royalty. But because of the provision limiting the allowance to fifty per cent of the net income from the property, the actual depletion allowance on limestone claimed in the 1951 return was $107,929.01 or fifty per cent of a net income of $215,858.03 on assumed limestone sales.

In its complaint in the instant case the company asserted that both of its determinations referred to above were in error. It alleged that the "commercially marketable product" was not limestone in slurry, but Portland cement produced in bulk or in sacks. It averred that the limestone utilized in the process of manufacturing Portland cement was "chemical grade limestone" rather than "calcium carbonate." Applying the higher gross income and higher depletion allowance rate derived from these new determinations, as limited by the fifty per cent provision of § 114(b) (4) (A), Monolith sought a refund in the amount of $166,-811.04. This was later raised to $264,-435.41.

In granting judgment in this amount the court found that the "commercially marketable product" within the meaning of § 114(b) (4) (B) was bulk Portland cement. The Government does not now contest that finding.

The court further found and concluded, however, that the limestone was not "chemical grade limestone" within the meaning of § 114(b) (4) (A) (iii). It therefore applied the ten per cent depletion rate for "calcium carbonates." But by reason of the provision of § 114(b) (4) (A) limiting the allowance to fifty per cent of the net income from the property, the depletion allowance which could be claimed, however the limestone was classified, was actually somewhat less

than ten per cent. Therefore the court awarded the sum claimed by Monolith notwithstanding the fact that a ten per cent rather than a fifteen per cent depletion allowance was held to be otherwise applicable.

As before indicated, Monolith contests these findings and conclusions despite the fact that the judgment is in the full amount prayed for and that a fifteen per cent allowance would not have entitled it to any greater award. It claims to be aggrieved because of the asserted possibility that the findings and conclusions classifying its limestone as "calcium carbonates" may work a collateral estoppel as to its 1952 and 1953 tax returns. For 1954 and subsequent years there is no problem. In § 613(b) (6) of the Internal Revenue Code of 1954, 26 U.S.C.A., it is provided that the percentage depletion rate on limestone shall be fifteen per cent.

During oral argument counsel for the Government suggested that any possible prejudice of the kind feared by Monolith could be eliminated by directing that findings and conclusions dealing with the classification of the limestone be stricken.

■ As indicated, these findings and conclusions are not necessary to support the judgment that was entered. Their deletion will remove any possible prejudice which Monolith might suffer with regard to its 1952 and 1953 returns. It is directed that this be done. With these findings and conclusions stricken, there is nothing left for us to review on this branch of the case.

■ The process of manufacturing Portland cement, as described above, requires that certain materials in addition to limestone be added to and blended with the crushed limestone at various stages. The district court computed the depletion deduction on the sales price of the cement without excluding the value of these other materials. This was done on the theory that they were added as part of the "ordinary treatment processes" referred to in § 114(b) (4) (B), quoted above.

On its cross-appeal the Government contests this method of computation. It concedes that the act of blending these raw materials is an ordinary treatment process in making Portland cement. Accordingly, it does not object to the inclusion in the depletion base of the cost of labor, electricity, and the like, used to physically mix the limestone with other raw materials. It is argued, however, that the income attributable to the added materials themselves should not be included in the depletion base.

The Government's position seems to be premised on the view that under the method used by the district court Monolith's depletion allowance was not confined to the depletion of the limestone deposit. Instead, the argument goes, the company was also allowed depletion on the added materials, some of which it mined and some of which it purchased. It is pointed out that Monolith or others may have already received a depletion allowance on these added materials. The Government would avoid this result by drawing a distinction between what it calls a "process" and an "ingredient."

In our view the addition of the relatively small amounts of other materials was part of the "ordinary treatment" process in converting limestone into Portland cement. We perceive no reason for distinguishing between the cost of the additives and the cost of blending them with limestone in computing the depletion base.

The base on which the depletion allowance is to be computed is that of a commercially marketable product. If the raw product of the mine is not commercially marketable, then the base is to be the first commercially marketable product produced by applying ordinary treatment processes to such product. Cherokee Brick & Tile Company v. United States, D.C., 122 F.Supp. 59, 63–64, affirmed 5. Cir., 218 F.2d 424. See, also, United States v. Sapulpa Brick and Tile Corp., 10 Cir., 239 F.2d 694, 697. In our case the court found that the first commercially marketable product of the limestone resulting from the application of ordinary treatment processes was Port-

land cement. The Government has accepted that finding.

Once this finding is made, the gross income from the sale of the cement becomes the depletion base. We find no warrant in the statute for excluding from this gross income that part representing the value of the additives. To say that the addition of other materials was not a part of the ordinary treatment process is to undercut the accepted finding that Portland cement, which requires the addition of such materials, is the first marketable product resulting from the use of ordinary treatment processes.

The method of computation employed by the trial court does not allow depletion on the additives. Depletion is allowed a mine owner for exhaustion of his natural deposit. As a practicable way of computing that depletion, the gross income from the sales of the marketable product of the mine is taken as a base. This is only a method of computation. It does not represent the allowance of depletion on any process or product. Dragon Cement Company v. United States, 1 Cir., 244 F.2d 513, 516.

 The Government's proposal would introduce complexities which would make it difficult to compute a depletion allowance with any assurance. As Monolith points out in its reply brief, at least five different methods of computation involving nine possible variations would have to be taken into consideration. In our view Congress intended to provide a simple, practical rule which could be applied with some measure of confidence in computing the depletion deduction. See Dragon Cement Company v. United States, supra, pages 514, 516. The method utilized by the district court accords with that intention. The method proposed by the Government does not.

Both parties cite decisions in support of their respective positions, but we find only one which appears to be directly in point. In Sparta Ceramic Co. v. United States, D.C.Ohio, 168 F.Supp. 401, the Government contended that the cost of body additives in manufacturing tile from clay should be excluded in calculating the depletion allowance. The argument was the same as that advanced here—that the cost of the additives is not to be considered a part of ordinary treatment process. Rejecting this contention, the court said (page 405):

"The use of additives would appear to be an ordinary process applied to obtain a commercially marketable product. Although not all of the tile produced by plaintiff contained body additives, expert testimony was given that in those instances in which it was used it was necessary to do so to avoid undesirable scumming effects resulting from certain clay mixtures, and that this was a normal practice in the industry."

The cause is remanded to the district court with directions to enter revised findings of fact and conclusions of law which do not have the effect of characterizing taxpayer's limestone as either calcium carbonate or chemical grade limestone. In all other respects the judgment is affirmed.