R. A. RIDDELL, District Director of
Internal Revenue, Los Angeles
District, Appellant,

v.

MONOLITH PORTLAND CEMENT CO.,
Appellee.

No. 16914.

United States Court of Appeals
Ninth Circuit.

March 23 and 24, 1962.

Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson and Melva M. Graney, Attys., Dept. of Justice, Washington, D. C., and Francis C. Whelan, U. S. Atty., Robert H. Wyshak and Eugene N. Sherman, Asst. U. S. Attys., Los Angeles, Cal., for appellant.

Joseph T. Enright, Norman Elliott and Bill B. Betz, Los Angeles, Cal., for appellee.

Before BARNES, HAMLIN and JERTBERG, Circuit Judges.

BARNES, Circuit Judge.

This is another of the "statutory percentage mining depletion allowance" cases, involving taxpayer's 1952 return. We have for consideration the effect on this case, if any, of United States v. Cannelton Sewer Pipe Co., 1960, 364 U.S. 76, 80 S.Ct. 1581, 4 L.Ed.2d 1581, as well as the effect of the previous Monolith decision (Monolith Portland Cement Co. v. United States, 9 Cir. 1959, 269 F.2d 629),[1] determining the same taxpayer's 1951 liability.

1. Hereinafter referred to as the "first Monolith case" or the "1951 proceedings."

An income tax liability of $156,286.65 shown on appellee's [2] 1952 return was paid by taxpayer in 1953. An additional $25,396.60, plus interest of $5,002.43, was assessed against it and paid in 1956. Taxpayer filed, on or about February 24, 1956, a timely claim for refund of $99,070.81 in taxes paid for 1952, which was disallowed by appellant.[3] Taxpayer and appellant executed a timely extension of the period of limitations for the calendar year 1952; within six months thereafter, taxpayer filed two more claims for refund in the amounts of $181,683.24 and $82,612.44 respectively, which were neither allowed nor disallowed. Within the time provided in Section 3772 of the Internal Revenue Code of 1939, 26 U.S.C.A. § 3772,[4] taxpayer brought this action in the district court for a refund of taxes which included a claim for taxes paid in 1952 in the amount of $186,753.30.[5] Jurisdiction was conferred upon the district court by Section 1346, Title 28, United States Code. Judgment in favor of the taxpayer in the principal amount of $186,753.40, plus interest, was entered on December 17, 1959. A timely notice of appeal was filed by the government. This court has jurisdiction to review the judgment entered in the district court by virtue of Section 1291 of Title 28, United States Code.

Taxpayer filed a motion for summary judgment below, and pursuant thereto, the district court considered the taxpayer's motion, its affidavits, the statement of undisputed facts and the stipulations between the parties, the government's affidavits, admissions in its answer and its answers to taxpayer's request for admissions and interrogatories, and, in addition, took judicial notice of the first Monolith case (which was between parties in privy involving the year 1951). The district court held that the 1951 proceeding was *res judicata* as to all issues but, preferring not to rest its decision solely on that ground, also decided the merits in favor of taxpayer, stating that there was no genuine disputed issue of fact and that the case was an appropriate one for summary judgment because the issues were of law rather than of fact and that in any event, since the underlying and evidentiary facts were admitted and undisputed, all that remained was to apply the proper legal principles to undisputed facts. Summary judgment was entered in favor of the taxpayer and the government appealed.

The facts as found by the district court may be summarized as follows:

Taxpayer is a Nevada corporation which has its principal office in Los Angeles, California, and is engaged in the manufacture and sale of finished cement in its plant at Monolith, California. In connection with that plant and immediately adjacent thereto (within less than fifty miles) the taxpayer operates an extensive mineral desposit known as its Monolith quarry. During the year in question taxpayer extracted limestone from its quarry which it used to make cement in its plant. All of the extracted limestone was used by the taxpayer exclusively for that purpose.

In the process of making cement, taxpayer added to the limestone small amounts of certain other materials which it mined, as well as some purchased materials. The processes used by taxpayer in making cement were those normally applied in the cement industry by cement manufacturers having deposits similar to taxpayer's.[6]

---

2. Hereinafter sometimes referred to for convenience as "taxpayer."

3. Hereinafter sometimes referred to for convenience as the "government."

4. Unless otherwise specifically noted, all references to "Section" or "Code" shall mean a section of, or the Internal Revenue Code of 1939.

5. The complaint contained five causes of action, the last four of which claimed refunds for the years 1953 and 1954; the last four causes of action were dismissed pursuant to stipulation of the parties.

6. In the present case the district court incorporated by reference its findings of fact in the first Monolith case to the extent not inconsistent with its other findings of fact in the instant case.

During 1952 it was not economically or commercially feasible for the taxpayer to use any of its limestone in the production of dimension stone or crushed stone.

The taxpayer's gross sales of finished cement for the year 1952 amounted to $8,393,507.11. The elimination therefrom of amounts attributable to certain operations or practices which the district court found were not ordinary treatment processes, such as bagging,[7] leaves a figure of $6,565,070.44 which the district court called taxpayer's "gross income from mining."

The limestone mined by taxpayer in 1952 and used by it to make finished cement came from the same quarry from which the taxpayer obtained the limestone it used in 1951 and was substantially identical in chemical content to such 1951 limestone. It is stipulated that taxpayer's limestone deposit "is a metamorphosed recrystallized limestone."

During the year 1952 the limestone in taxpayer's deposit was commonly regarded as and understood to be either "calcium carbonates" or "chemical grade limestone" and was not commonly regarded as or understood to be "marble" or "stone." During the year 1952 the limestone was either "calcium carbonates" or "chemical grade limestone" within the commonly understood commercial meaning of those terms.

The district court held that the taxpayer's limestone was "calcium carbonates" or "chemical grade limestone;" that it was unnecessary to determine which in view of the fact that the percentage depletion allowance is limited to fifty per cent of the net income from mining (which here means taxpayer could not take the higher depletion allowance for "chemical grade limestone" even if its stone were to be found to be so classified); that taxpayer's 1952 "gross income from mining" (its depletion base) was $6,565,070.44; that its percentage depletion allowance, as limited to fifty per cent of its net income from mining, was $463,739.44; and that it therefore should have paid no income tax in the year 1952. Judgment was accordingly entered in favor of taxpayer for a refund of taxes in the amount of $186,753.40, plus interest.

Appellant urges that the district court erred in the following respects:

"1. In holding that the taxpayer's limestone is either 'calcium carbonates' or 'chemical grade limestone' rather than 'marble' within the meaning of Section 114(b) (4) (A) of the Internal Revenue Code of 1939 and that the taxpayer's percentage depletion allowance therefore need not be computed by using the lesser 5 per cent rate.

"2. In holding that, within the meaning of Code Section 114(b) (4) (B), 'mining' includes all of the processes which the taxpayer used in making cement and that the taxpayer's finished cement in bulk is the 'commercially marketable mineral product' to which mining extends and on which the taxpayer is entitled to depletion. In this connection, the court also erred in failing to hold that 'mining' only extends to crushing the limestone (properly classified as marble), that the other minerals added to the limestone in making cement were not shown to be depletable, and that crushed limestone (properly classified as marble), is the 'commercially marketable mineral product' to which mining extends and on which the taxpayer is entitled to depletion.

"3. In holding that the doctrines of *res judicata* and collateral estoppel bar consideration of issues 1 and 2 on their merits.

"4. In awarding summary judgment on issues 1 and 2."

---

7. The excluded items are as follows: the cost of bags or sacks, placing and shipping the cement in bags or sacks, the operation of a cattle ranch, certain royalties, the allowance of trade discounts, contract trucking and fleet trucking cost, rail freight costs, and warehouse and bulk storage plant costs at distribution points away from the taxpayer's cement plant.

■ As Judge Magruder points out so clearly in his Dragon Cement Company v. United States opinion (1 Cir. 1957, 244 F.2d 513, cert. denied, 355 U.S. 833, 78 S.Ct. 50, 2 L.Ed.2d 45):

"[T]he allowance for depletion has been a controversial subject for years, and officials of the executive branch have sought from time to time, with conspicuous lack of success, to persuade the Congress to eliminate some of its alleged over-generous features. See Mertens, Law of Federal Income Taxation § 24.04 (1954). We are not concerned with the wisdom or policy of the statutory allowance, once we are sure what the allowance is, for it is plainly our judicial function merely to apply the allowance as Congress wrote it and meant it." (Id. 244 F. 2d at 514.)

The Dragon Cement opinion then states the background that must be kept in mind before we meet the peculiar problem inherent in the mining of raw material from which cement is made, as distinguished from other "ores" or "minerals." [8]

8. "The need for and fairness of some allowance for depletion proceeds from the fact that the production of income through the exploitation of natural resources is accompanied by an inevitable consumption of capital in the form of the gradual exhaustion of the natural resource being exploited. Thus the allowance serves to offset the injustice of classifying only as income what might be regarded as income commingled with return of capital, and serves also as an incentive to encourage capital expenditures in the direction of discovery and exploitation of natural resources.

"Of the three types of depletion allowance prescribed at various times by the Congress, percentage depletion (with which we are now concerned) is to be contrasted with cost depletion and discovery depletion. Cost depletion, based upon the cost to the taxpayer of the particular deposit, seeks to return to the taxpayer free of tax that portion of his cost attributable to the amount of the deposit used up in earning the income on which he is taxed during a given taxable year. Discovery depletion seeks to reward the taxpayer for the discovery of unknown natural deposits, and has usually been based upon the fair market value of the deposit within thirty days after the date of its discovery. By the third type of depletion allowance, percentage depletion, the Congress hoped to furnish an easily computable allowance that would avoid many of the complications arising in connection with the computation of cost or discovery depletion. Percentage depletion is based upon a fixed percentage of the income realized during the taxable year from the exploitation of a piece of property—the percentage varying, somewhat arbitrarily, depending upon the kind of deposit involved.

"With the gradual enlargement of the categories of mineral properties to which the percentage depletion became applicable, the Congress has at the same time automatically eliminated discovery depletion in respect to such deposits. In general, percentage depletion has remained as an alternative to cost depletion, so that even if the taxpayer fails to establish the cost of the property, he nevertheless may be entitled to the allowance of a percentage depletion. It is also true, as pointed out in Mertens. Law of Federal Income Taxation § 24.31a (1954), 'that through percentage depletion a taxpayer may recover more than his cost over the life of the property.'

"For present purposes we need go no further back than to the provisions of the Internal Revenue Code of 1939.

"Section 23 of this Code contained the following (53 Stat. 12, 14):

" 'Sec. 23. Deductions from Gross Income.

" 'In computing net income there shall be allowed as deductions:

\* \* \* \* \*

" '(m) Depletion.—In the case of mines, oil and gas wells, other natural deposits, and timber, a reasonable allowance for depletion and for depreciation of improvements, according to the peculiar conditions in each case; such reasonable allowance in all cases to be made under rules and regulations to be prescribed by the Commissioner, with the approval of the Secretary. \* \* \*

" '(n) Basis for Depreciation and Depletion.—The basis upon which depletion, exhaustion, wear and tear, and obsolescence are to be allowed in respect of any property shall be as provided in section 114.'

"Section 114(b) (1) stated as the general rule (53 Stat. 45) that the basis for

We next note that the Dragon Cement case, supra, like our instant case, and unlike Cannelton, supra, involves the raw material from which cement is "manufactured."

Turning to Cannelton, we first note that it differs in its facts from our instant case in that in Cannelton (a) there was a local market in "ground fine clay," the first "commercially marketable prod-

the depletion allowance should be the adjusted basis in § 113(b) for determining gain upon the sale or other disposition of such property, except as otherwise provided in the ensuing paragraphs numbered (2), (3) and (4). Paragraph (2) related to discovery value in the case of certain mines. Paragraph (3) gave a percentage depletion formula for oil and gas wells. Paragraph (4) gave percentage depletion formulas for coal, metal, and sulphur mines (but not including the type of deposit involved in the case at bar), and provided allowances based upon a prescribed percentage of the 'gross income from the property during the taxable year'.

"The phrase 'gross income from the property' was undefined as it appeared in the 1939 Code. It thus had a lurking ambiguity where the mine owner customarily performed more than merely extractive operations before realizing any income; in such cases, would the basis for the depletion allowance include gross income from what in other contexts might be described as manufacturing operations upon the extracted property? The statute did not make this point clear, and Regulation 111, as originally issued, naturally sought to narrow the scope of the allowance.

"In the Revenue Act of 1943 (58 Stat. 45), the Congress attempted to resolve this ambiguity by inserting a definition of 'gross income from the property' in a new § 114(b) (4) (B), reading in part as follows:

" '(B) Definition of Gross Income From Property.—As used in this pargaraph the term "gross income from the property" means the gross income from mining. The term "mining", as used herein, shall be considered to include not merely the extraction of the ores or minerals from the ground but also the ordinary treatment processes normally applied by mine owners or operators in order to obtain the commercially marketable mineral product or products. The term "ordinary treatment processes", as used herein, shall include the following: (i) In the case of coal—cleaning, breaking, sizing, and loading for shipment; (ii) in the case of sulphur—pumping to vats, cooling, breaking, and loading for shipment; (iii) in the case of iron ore, bauxite, ball and sagger clay, rock asphalt, and min-

erals which are customarily sold in the form of a crude mineral product—sorting, concentrating, and sintering to bring to shipping grade and form, and loading for shipment; and (iv) in the case of lead, zinc, copper, gold, silver, or fluorspar ores, potash, and ores which are not customarily sold in the form of the crude mineral product—crushing, grinding, and beneficiation by concentration (gravity, flotation, amalgamation, electrostatic, or magnetic), cyanidation, leaching, crystallization, precipitation (but not including as an ordinary treatment process electrolytic deposition, roasting, thermal or electric smelting, or refining), or by substantially equivalent processes or combination of processes used in the separation or extraction of the product or products from the ore, including the furnacing of quicksilver ores.'

"It is apparent that the Congress intended not to limit the computation of the percentage depletion allowance to the gross income attributable to purely extractive processes, for the deposit when thus first extracted might not be in a commercially marketable form, and might require further processing. Congress accomplished this by providing for the first time a general formula, and by giving nonexclusive illustrations of processes included in the phrase 'ordinary treatment processes'. See § 3797(b) of the Code of 1939, 53 Stat. 470. The general formula, which of course is controlling, is that the basis for computing the percentage depletion allowance shall be the 'gross income from mining', defined as including 'not merely the extraction of the ores or minerals from the ground but also the ordinary treatment processes normally applied by mine owners or operators in order to obtain the commercially marketable mineral product or products.' Thus we must look to see what processing is normally undertaken by a mine owner or operator in order to obtain a commercially marketable product, and when such a salable product is obtained, then the gross income from the sale of such product is the base upon which to apply the percentage depletion allowance. That these 'ordinary treatment processes' are not necessarily limited to those processes which leave the extracted deposit in its natural state is clear from the inclusion, as an illustration in § 114(b)

uct" originally claimed by taxpayer (although subsequently taxpayer claimed the first commercially marketable product was the finished product, *i. e.*, sewer pipe); (b) there was "a substantial market for the raw mineral" in Indiana and Kentucky, even though not marketable at a profit.

Next, we know that (1) Cannelton holds that "marketability of the raw material" at a profit is of no significance; (2) the "ordinary treatment processes" to be included in the depreciable value are not those of the fully or partially integrated miner, but they are "the 'ordinary' normal ones applied by the non-integrated miner." (3) "The Congress," says Cannelton, "intended the integrated mining-manufacturing operations to be treated as if the operator were selling the mineral mined to himself for fabrica-

tion." And then the following significant statement is made:

"It would, of course, be permissible for such an [integrated] operator to calculate his 'gross income from mining' at the point where 'ordinary' miners—not integrated—disposed of their product."

Apparently for the foregoing reason (among others, perhaps) the cases relied on by the respondent in Cannelton were found not apposite, although no approval of their holdings was indicated. (Cf.: 364 U.S. note 10, p. 90, 80 S.Ct. 1581 Cannelton, supra.) Although but four cases are cited by name (United States v. Cherokee Brick & Tile Co., 5 Cir. 1955, 218 F.2d 424; United States v. Merry Brothers Brick & Tile Co., 5 Cir. 1957, 242 F.2d 708; Commissioner of Internal Revenue v. Iowa Limestone Co., 8 Cir. 1959, 269 F.2d 398; Bookwalter v. Cen-

---

(4) (B), of the process of furnacing quicksilver ores, which involves a chemical change.

"It would also be helpful, in a preliminary way, to observe that the depletion allowance is not an allowance upon any *process*, whether a mining process or a manufacturing process. Nor is it an allowance, as such, upon any product. Instead, it is an allowance to the mine owner designed as a simple means to diminish his taxable income from the exploitation of a natural resource which is necessarily exhausted in the process. In making this allowance, the Congress has elected not to limit the deduction in all cases to the taxpayer's actual cost or other basis in the land from which the ore or mineral is extracted. To supply a simpler rule, the Congress has turned more and more to the method of percentage depletion, which differs from both cost and discovery value depletion in that it is measured by an arbitrary percentage of gross income from the property, without regard to the taxpayer's cost or discovery value.

"From the foregoing it is clear that by the enactment of 1943 the Congress for the first time introduced into the statute key language which had not theretofore appeared either in the statute or in the regulations thereunder, namely, a new definition of 'gross income from mining' as including 'not merely the extraction of the ores or minerals from the ground but also the ordinary treatment processes

normally applied by mine owners or operators in order to obtain the commercially marketable mineral product or products.' Notwithstanding this, the Commissioner has subsequently sought, by regulatory amendments to § 29.23 (m)–1(f) of Treas.Reg. 111, in cases where the mine owner customarily had to indulge in further processing other than merely extractive operations before obtaining a commercially marketable product upon which he could realize any income, to prescribe a relatively complex mathematical method for calculating the percentage depletion base. This would require an allocation of income derived from the sale of the first marketable product to the various treatment processes in proportion to their cost, with only those processes allowed as part of the base which occurred before any chemical change had taken place in the extracted mineral.

"By § 319 of the Revenue Act of 1951 (65 Stat. 497), the Congress amended § 114(b) (4) (A) of the Internal Revenue Code so as to extend the availability of percentage depletion for the first time to 'calcium carbonates,' which includes deposits of cement rock, the natural resource involved in the case at bar. The prescribed percentage for calcium carbonates was ten per cent of the gross income from mining the deposit." 244 F.2d at 514–517.

tropolis Crusher Co., 8 Cir. 1959, 272 F. 2d 391), we assume that in addition to those cited by respondent in Cannelton there should be mentioned Dragon Cement Company v. United States, supra; Townsend v. Hitchcock Corporation, 4 Cir. 1956, 232 F.2d 444; United States v. Sapulpa Brick & Tile Corp., 10 Cir. 1956, 239 F.2d 694.

In the Dragon Cement case, supra, the first circuit was persuaded that it should not "create a conflict with our brethren in other courts of appeals," and held that a taxpayer is entitled to a percentage depletion deduction based upon its gross income from cement, as that was the intention of Congress.

For that reason we look to the post-Cannelton decisions of other circuits. In United States v. Portland Cement Co. of Utah, 1961, 293 F.2d 826, the tenth circuit held that "cement rock" was "calcium carbonate;" and that the case should be remanded for consideration as to what are "the ordinary treatment processes normally applied by" cement rock "miners or operators in order to obtain the commercially marketable mineral product or products."

The government there, and here, concludes the ordinary treatment processes included in mining would terminate with the crushing operation, *for at that point the mineral can be shipped to a manufacturer for processing;* and that even if there be no market for crushed cement rock (because all cement rock miners are also cement manufacturers), for depletion purposes the taxpayer-manufacturer will be considered as purchasing from himself, as a miner, the raw material used in making cement.

It is true that in Cannelton the Court stated:

"The question in depletion is what allowance is necessary to permit tax-free recovery of the capital value of the minerals." (364 U.S. at 86, 80 S.Ct. at 1587.)

As a declaration of the basic philosophy behind depletion allowances, this is true. But because of the closeness with which the case must be examined broad generalizations such as above cited must be explored. The Court's statement is true, in principle, but clearly Congress has failed to stop at any such point as capital value in dealing with the problem.

If by granting a depletion allowance the Congress had intended to simply permit tax-free recovery of the capital value of the minerals it need not have enlarged the categories of minerals to which percentage depletion allowances became applicable; i. e., Congress could have continued to use the more complicated cost or discovery depletion allowances.[9] But instead Congress became more and more generous with a certain class of taxpayers by enlarging the categories of minerals to which percentage depletions applied. We believe Congress must be held to have knowingly granted a more generous depletion allowance when it enlarged percentage depletion allowance applicability; i. e., it knew full well that more than the mere capital value of the mineral would be recovered. This view would seem to be strengthened when § 114(b) (4) (B) is read, for therein Congress allowed certain processes to be included in the allowance which go beyond the capital value of various listed minerals as they lay in the land in their raw state.

The Court in Cannelton stated:

"This position leads to the conclusion that respondent's mineral product has no value to it in the ground. If this be true, then there could be no depletion. One cannot deplete nothing." (364 U.S. at 88, 80 S.Ct. at 1587.)

In the instant case, the district court found that there was *no* market for taxpayer's mineral until such time as it was processed into finished cement. Perhaps the limestone had no value to taxpayer

---

9. For excellent discussions of the various types of depletion allowances, See Dragon Cement Company v. United States, 1 Cir.

1957, 244 F.2d 511, 514–515, and 4 Mertens, Law of Federal Income Tax § 24.04 (1960).

before this time, but Congress granted a depletion allowance on the "commercially marketable mineral product"—not the mineral lying in the ground in a raw state.

The Court in Cannelton goes on to say:

"If it [the depletion allowance] were extended as respondent asks, the miner-manufacturer would enjoy, in addition to a depletion allowance on his minerals, a similar allowance on his manufacturing costs, including depreciation on his manufacturing plant, machinery and facilities." (364 U.S. at 88, 80 S.Ct. at 1588.)

In our opinion Congress necessarily recognized this very fact when it allowed certain processes, which require machinery, to be included in the computation of the percentage depletion allowance. What difference does it make whether the miner-manufacturer takes a deduction (on certain assets) in the form of a depletion allowance or as depreciation; he will get one or the other, but not both.[10]

The Court in Cannelton also stated:

"We believe that the Congress intended integrated mining-manufacturing operations to be treated as if the operator were selling the mineral mined to himself for *fabrication*." (Emphasis added.) (364 U. S. at 89, 80 S.Ct. at 1588.)

In the instant case taxpayer is not a fabricator. If it used its cement to fabricate concrete or cement sewer pipe, clearly Cannelton would apply. If it had bypassed a market—as did the taxpayer in Cannelton—then also Cannelton would clearly apply; to the contrary, here the district court found there was *no* market (presumably either profitable or unprofitable) for taxpayer's limestone *until* it was processed into finished cement. As the Court in Cannelton stated in its footnote 10, supra: "For our purposes we need not reach the question of whether in those [*e. g.*, cement] cases the minerals in place had any 'value' to be depleted. * * *" Here the district court found that taxpayer did not have a commercially marketable mineral product until taxpayer had processed its limestone into finished cement. In Cannelton the taxpayer had a commercially marketable mineral product (albeit unprofitable) before it fabricated sewer pipes. We hold Cannelton to be distinguishable.

Congress gave us something of its view of Cannelton in passing recent legislation relating to the cement industry.[11] This legislation was passed in 1960 to give those integrated miner-manufacturers of mineral used to make cement an election to use a cutoff point to mining at the prekiln feed stage. The crucial phrase in this legislation seems to be the Congressional reference to "existing law" in the Committee Report [12] accompanying the legislation. This Report, in part, reads as follows:

"It is understood that for these prior years the Government may well contend that under the Cannelton decision the cutoff point for the minerals in question occurs at an earlier stage of processing than set forth in the previous ruling. On the other hand, it is understood that certain taxpayers in the cement industry take the position that the principles enunciated in the Cannelton case do not apply to them, and that they are entitled to depletion on the basis of finished cement for years prior to 1961. Under such circumstances there is a reluctance to settle cases for the past years on the basis of the published ruling and it is probable that in the absence of this amendment there would be continued and widespread litigation in this area.

" * * * In order to encourage the settlement of this question, section 7 of the bill as amended by your committee permits taxpayers mining minerals used in

---

10. 4 Mertens, Law of Federal Income Tax § 24.02 (1960).

11. Section 4 of the Act of September 14, 1960, P.L. 86-781, 74 Stat. 1017.

12. S.Rep. No. 1910, 86th Cong., 2d Sess., pp. 8–12.

making cement to elect to apply, for the years prior to 1961, the cutoff point provisions adopted in the Public Debt and Tax Rate Extension Act of 1960. Under this proposal, if a taxpayer failed to make the election, the cutoff point in his case for these years would be determined under existing law."

Appellant states that Congress enacted this legislation to grant relief from Cannelton as to particular groups of integrated operators. But, appellant argues, taxpayer did not elect the pre-kiln feed cutoff point; it elected instead to litigate for depletion on cement. And argues appellant "in [this] litigation, it [taxpayer] is claiming that *under* Cannelton it is entitled to even more than it could have received as *relief from* Cannelton." (Emphasis appellants'.)

We do not infer, from the Committee Report, that Congress deemed Cannelton to be "the law" as to cement operators. We infer that Congress was silent as to what the "existing law" might be as to individual cement operators; we infer that Congress gave these taxpayers an opportunity to buy their peace, rather than pursue the long and expensive alternative of litigating in hopes of obtaining that which they thought was theirs. We infer that Congress offered a compromise which it considered fair, as an alternative to pursuing a course of litigation in hopes of proving Cannelton inapplicable and gaining a more advantageous cutoff point for mining.

Since depletion allowances were first granted by Congress, the executive and administrative branches have struggled to narrow—or eliminate—their use. When this question is presented to Congress, each time Congress answers by enlarging the applicability of depletion allowances; i. e., Congress answers by becoming even more generous. In the light of the typical Congressional attitude on depletion allowances, we see no basis for the inference that, in its most recent legislation, Congress has reversed itself and has become less sympathetic to miners and miner-manufacturers. As stated by the Court in Cannelton (and Dragon Cement, supra):

"We are not concerned with the validity of this theory or with the statutory policy. Our sole function is application of the congressional mandate." (364 U.S. at 81, 80 S.Ct. at 1584.)

As we have attempted to show above, Cannelton does not apply to the fact issues presented in the instant case. Indeed, the Court there expressly stated that it was not disturbing prior law which, in part, related to the cement industry. This was done in plain language. Surely Congress considered such plain language. And it follows then that "existing law" for the cement industry (i. e., for taxpayers operating within the same factual circumstances as taxpayer herein) must be deemed to be the Dragon Cement and first Monolith cases.[13]

We come to this conclusion with reluctance, because of some doubt if it can be reconciled with the reasoning of the Supreme Court in Cannelton.

It may well be that the Supreme Court will extend the underlying and basic philosophy with respect to depletion in the Cannelton "clay" case to the "cement" cases. Thus far it has refused to do so. We believe Congress has, "in its wisdom," gone beyond the bare concept that one cannot claim depletion on that which has

13. Appellant contends that this court decided two cases, after Cannelton, which support its position here. But these cases are clearly distinguishable (United States v. Pacific Clay Products, 1960, 285 F.2d 215, and Riddell v. Victorville Lime Rock Co., 1961, 292 F.2d 427). (In saying this, we except the "marble" issue presented here and in the Victorville case, supra.) In Pacific Clay, taxpayer mined six varieties of clay; and the record there indicated that there was some evidence of crude clay sales i. e., a market for crude clay. In Victorville, taxpayer was not in the cement industry, and was found to have commercially marketable mineral products entirely different from the product found by the district court in the instant case, i. e., certain minerals were commercially marketable without extensive treatment processes.

no value in the ground, in defining what is depletable. Issues of public policy are involved. We are required to await one determination or another.[14]

We refer to the recent decision of the Supreme Court in the James case (James v. United States, 1961, 366 U.S. 213, 81 S.Ct. 1052, 6 L.Ed.2d 246) resting upon a fundamental fairness to those charged with criminal acts, that prevented that Court making the new rule of James with respect to the taxability of embezzled funds retroactive so long as Commissioner of Internal Revenue v. Wilcox, 1946, 327 U.S. 404, 66 S.Ct. 546, 90 L.Ed. 752, was the law of the land (despite its previous "thorough devitalization" by Rutkin v. United States, 1945, 343 U.S. 130, 72 S.Ct. 571, 96 L.Ed. 833).

By the same reasoning, we do not believe a taxpayer should be denied for depletion on a nonsalable intermediate product of mining operations when he has in good faith relied upon appellate decisions which were not taken to the Supreme Court for final determination by the government.

We believe such thinking was at least partially responsible for the attempt made by Congress to enact legislation to encourage settlement of these depletion cases.

■ The district court, following this court's instructions given in the first Monolith case, correctly held that it was unnecessary to decide whether taxpayer's limestone is "calcium carbonates" or "chemical grade limestone" (having ten and fifteen per cent depletion allowances respectively) because in any event taxpayer fell within the fifty per cent net limitation. Hence the remaining question is whether taxpayer's limestone is either "calcium carbonate" or "chemical grade limestone," as found by the district court, or "marble" as contended by appellant, within the meaning of § 114(b) (4) (A).

■ The district court found the limestone in taxpayer's deposit to be commonly regarded as and understood to be either "calcium carbonates" or "chemical grade limestone" and that it was *not* commonly understood or regarded to be "marble" or "stone." The district court also found, *inter alia*, that the limestone was *not* "marble" or "stone" within the commonly understood commercial meaning of those terms. We cannot say that these findings are clearly erroneous. There is ample evidence in the record to support these findings. And what was said by this court in Victorville, supra, seems equally applicable here:

"The Senate Finance Committee, in reporting on paragraphs (i), (ii) and (iii) of Section 114(b) (4) (A), (i) of which includes 'marble' in the five per cent depletion rate, (ii) of which includes calcium carbonate (ordinary limestone) in the ten per cent depletion rate, and (iii) of which includes 'metallurgical grade limestone' and 'chemical grade limestone' in the fifteen per cent depletion rate, states, 'The names of the various enumerated minerals are, of course, intended to have their commonly understood commercial meanings.' * * *

"This congressionally expressed intent has received judicial approbation and application. [Citations.]

* * * * * *

"The record reflects that appellee's deposit is not suitable for the production of dimension marble. * * * We find nothing in the legislative history to lead us to believe that Congress adopted a standard which would compel the classification of appellee's deposit as 'marble' within the commonly understood commercial meaning of that term." (292 F.2d at 432–433.)

We therefore believe the district court correctly held taxpayer's limestone to be "not marble" within the meaning of § 114 (b) (4) (A).

■ Appellant's second contention urged in this appeal is that the district

---

14. See concurring opinion of Judge Duniway in Simcox v. Madigan, 9 Cir., 298 F.2d 742.

court erred in allowing taxpayer to include all of the processes which it used in making cement, and that its finished cement in bulk is its "commercially marketable mineral product" on which taxpayer is entitled to depletion.

Having concluded that Cannelton does not work a change as to taxpayer's circumstances as found by the district court, it seems well settled that cement is a "commercially marketable mineral product" within the meaning of § 114(b) (4) (A). This was held to be so in the Dragon Cement case and apparently was sufficiently settled for the government not to see fit to contest such a holding made by the district court in the first Monolith case. Though the district court decided both these cases prior to Cannelton, we believe it correctly held that taxpayer's finished cement in bulk is its first commercially marketable mineral product on which taxpayer is entitled to depletion.

Appellant's third contention need not be considered at length. Though we might well agree with the district court's conclusion that *res judicata* and collateral estoppel bar consideration of appellant's contentions, we too have preferred to go to the merits of the issues. We think the interest of the parties—and of the public—are better served by so doing.

In answer to appellant's last contention, we hold the district court correctly granted summary judgment.

Affirmed.