336 F.2d 402
 UNITED STATES of America, Appellant,
v.
MONOLITH PORTLAND MIDWEST COMPANY, Appellee.
MONOLITH PORTLAND CEMENT COMPANY, Appellant,
v.
R. A. RIDDELL, District Director of Internal Revenue, Los Angeles, District, Appellee.
 No. 18505.
 No. 18776.
 United States Court of Appeals Ninth Circuit.
 August 22, 1964.
 Rehearing Denied October 1, 1964.
 
 John B. Jones, Jr., Acting Asst. Atty. Gen., Lee A. Jackson, Melva M. Graney, Dept. of Justice, Washington, D. C., Francis C. Whelan, U. S. Atty., Loyal E. Keir, Asst. U. S. Atty., Chief, Tax Section; Los Angeles, Cal., for appellants (in 18505) and appellee (in 18776).
 Joseph T. Enright, Norman Elliott, Bill B. Betz, Los Angeles, Cal., for appellee (in 18505) and appellant (in 18776).
 Before BARNES and JERTBERG, Circuit Judges, and McNICHOLS, District Judge.
 BARNES, Circuit Judge:
 
 
 1
 Two actions have been consolidated on appeal because of common questions of law and fact. In No. 18505 the government appeals from a judgment for Monolith Portland Midwest Company (hereinafter referred to sometimes as Midwest) denying income taxes for the taxable years 1951 and 1952. In No. 18776 Monolith Portland Cement Company (hereinafter referred to sometimes as Monolith) appeals from a judgment for the government as to income taxes for the taxable year 1952.
 
 
 2
 The district court had jurisdiction of the causes pursuant to 28 U.S.C. §§ 1345 and 1346. This court has jurisdiction of the appeals under 28 U.S.C. § 1291.
 
 
 3
 The controversies in both cases rest upon one real issue: what "cut-off point" in the taxpayers' integrated processes of changing mined limestone to manufactured cement must the taxpayers use to determine its value for purposes of determining their depletion allowances under Sections 23 and 114(b) of the Internal Revenue Code of 1939? In Monolith, the district court, pursuant to a Supreme Court mandate, held that the cut-off point was after the limestone was crushed. Originally the district court had held for the taxpayer on the ground that the cut-off point was at the finished bulk cement stage. This court had affirmed. Riddell v. Monolith Portland Cement Co., 1962, 301 F.2d 488. But the Supreme Court reversed on the authority of United States v. Cannelton Sewer Pipe Co., 1960, 364 U.S. 76, 80 S.Ct. 1581, 4 L.Ed.2d 1581. (Riddell v. Monolith Portland Cement Co., 1963, 371 U.S. 537, 83 S.Ct. 378, 9 L.Ed.2d 492, reh. den. 372 U.S. 932, 83 S.Ct. 871, 9 L. Ed.2d 737) On remand the district court then held for the government. Monolith now appeals.
 
 
 4
 In Midwest, the district court held that the cut-off point was after the cement was finished and ready for market.
 
 
 The Legal Background
 
 
 5
 In 1951 and 1952 Section 114(b) (4) (B) of the 1939 Code provided:
 
 
 6
 "As used in this paragraph the term `gross income from the property' means the gross income from mining. The term `mining' as used herein shall be considered to include not merely the extraction of the ores or minerals from the ground but also the ordinary treatment processes normally applied by mine owners or operators in order to obtain the commercially marketable mineral product or products, and so much of the transportation * * *. The term `ordinary treatment processes', as used herein, shall include the following: * * * (iii) in the case of * * * minerals which are customarily sold in the form of a crude mineral product — sorting, concentrating, and sintering * * * and loading * * * (iv) in the case of * * * ores which are not customarily sold in the form of the crude mineral product — crushing, grinding * * *."
 
 
 7
 On June 27, 1960 the Supreme Court held in Cannelton, supra, that the cut-off point for an integrated miner-manufacturer of fire clay-sewer pipe under this Act was the point where a non-integrated miner in the industry ordinarily shipped the product of his mine; not the point where the integrated miner-manufacturer shipped his final product (there sewer pipe). Since the fire clay was a product customarily sold in the form of a crude mineral product, this meant that the taxpayer could only include in his "ordinary treatment processes" the processes listed in Section 114(b) (4) (B) (iii) above. United States v. Cannelton Sewer Pipe Co., 1960, 364 U.S. 76, 80 S.Ct. 1581, 4 L.Ed.2d 1581.
 
 
 8
 In order to resolve the cut-off point question for 1961 and future years, Congress in the Public Debt and Tax Rate Extension Act of 1960 (74 Stat. 290, 293) modified a provision of the 1954 Code, § 613(c). As amended, this statutory provision established specific cut-off points for numerous minerals, including those used in the manufacture of cement. This cut-off point for cement-producing minerals (except for preheating of the kiln feed) was established as being just prior to the introduction of the kiln feed into the kiln. This conformed to Revenue Ruling 290 of the Treasury Department, released in 1953, C.B. 1953-2, 41. This point is somewhere between the crushed limestone point and the finished cement point. This amendment was enacted three days after the Cannelton decision.
 
 
 9
 Since widespread litigation would apparently continue as to what was the proper cut-off point in the cement industry for the tax years prior to 1961, Congress encouraged settlement of such litigation by providing, on September 14, 1960, that cement producers could, within sixty days, elect the pre-kiln cut-off point for the taxable years prior to 1961. If the election was not made, their depletion allowances would be determined under "existing law." Public Law 86-781, 74 Stat. 1018; S.Rep. No. 1910, 86th Cong., 2d Sess., pp. 8-12.
 
 
 10
 Neither Monolith nor Midwest elected the pre-kiln cut-off point. Instead they preferred to continue the litigation as to whether the cut-off point to which they were entitled under "existing law" was the crushed stone, pre-kiln, finished cement, or other point.
 
 
 Monolith
 
 
 11
 Monolith's cut-off point for the taxable year 1951 had already been determined in 1959 to be the finished cement. Monolith Portland Cement Co. v. United States, 9 Cir. 1959, 269 F.2d 629, 631, wherein the court pointed out that the government did not there challenge such determination by the district court.
 
 
 12
 Passing on the next taxable year of 1952, the district court, in its findings and conclusions filed six months before the Cannelton decision, held that the 1951 determination was res judicata and constituted collateral estoppel on the question of the cut-off point. Not wishing, however, to rest its decision solely on that procedural ground, the district court also ruled on the merits that the cut-off point for the taxable year was the finished cement point.
 
 
 13
 This court affirmed. Riddell v. Monolith Portland Cement Co., 9 Cir. 1962, 301 F.2d 488 (with two of this present panel sitting). Some of the details surrounding this action, although not necessary to the disposition of the case as presently at bar, are there related. This court held that Cannelton was distinguishable on the facts in that (1) it involved clay rather than limestone, and (2) that there was no commercial market for the limestone prior to its being made into finished cement. This court also held that since Cannelton was apparently not applicable to the cement industry, the "existing law" to which the Senate Report referred (as that under which non-electors' depletion cut-off points would be decided) must in cement cases be that which held that the cut-off point was "the finished cement." Moreover, this court referred to the policy against retroactive application of new judicial doctrine, as enunciated in James v. United States, 1961, 366 U.S. 213, 81 S.Ct. 1052, 6 L.Ed.2d 246. As for the taxpayer's collateral estoppel and res judicata arguments, this court then stated that "[t]hough we might well agree with [them] * * * we too have preferred to go to the merits of the issues." (301 F.2d at 498)
 
 
 14
 The Supreme Court summarily reversed on the certiorari papers alone, without allowing further briefs or oral argument. (371 U.S. 537, 83 S.Ct. 378, 9 L.Ed.2d 492) The Supreme Court held that Cannelton was controlling, and it pointed out that not only was crushed limestone "marketable in that form," in the words of Cannelton, but also that the record showed that it was actually sold in California in 1952 in an amount exceeding 1,500,000 tons and in the United States exceeding 216,000,000 tons. "We found that `the cut-off point where "gross income from mining" stopped has been the same' ever since the first depletion statute, namely `where the ordinary miner shipped the product of his mine.'" (371 U.S. at 539, 83 S.Ct. at 379) The Court then concluded: "The judgment [is] reversed, and the case is remanded for disposition in accordance with this opinion." There was no discussion in the Court's opinion of the "existing law," retroactivity, or the res judicata and collateral estoppel issues.
 
 
 15
 Because these issues had not been dismissed by the Supreme Court, the then respondent Monolith filed a petition for rehearing pointing out this fact; and that upon a reversal by the Supreme Court "only legal points examined, discussed and decided by the Court are affected by the decision" (citing Mutual Life Ins. Co. v. Hill, 1904, 193 U.S. 551, 24 S.Ct. 538, 48 L.Ed. 788). It was suggested that therefore (as well as for other reasons), the Supreme Court might well reverse and remand to the court of appeals "with directions for `proceedings in accordance with this opinion'", rather than a remand to the district court "for disposition in accordance with this opinion." Monolith's petition for rehearing was denied. 372 U.S. 932, 83 S.Ct. 871, 9 L.Ed.2d 737.
 
 
 16
 On the trial after remand, the district court judge entered new findings, conclusions, and judgment that the cut-off point was the crushed stone stage.
 
 
 17
 Monolith's appeal from that judgment is based on the argument that although the Supreme Court decided that Cannelton was controlling, it did not mention the "existing law," retroactivity, or collateral estoppel and res judicata issues. Thus, argues Monolith, the previous determinations of this court and/or of the district court on these issues are still the law of the case, and thus Monolith should still obtain its requested refund. We do not agree.
 
 
 18
 First, we think that the decision of the Supreme Court in the Monolith case demolishes these other arguments for Monolith. All four points go to the issue of whether the cut-off point for Monolith in 1952 was at "crushed stone," or at another point. That was the "case or controversy" facing the Supreme Court when it made its decision. Admittedly, the government, in its petition for a writ of certiorari, emphasized the Cannelton issue, with only a passing reference to the estoppel issue, and no reference to the retroactivity or "existing law" issues. (Opening Brief, Appendix, pp. 12-28.) But Monolith raised these other issues in its briefs in opposition to the petition for writ of certiorari, as independent grounds supporting the lower court decisions and thus made it unnecessary for the court to consider the applicability of Cannelton. This was followed by the petition for rehearing hereinabove mentioned, where these other three grounds were again mentioned and urged. Because of these factors, we conclude that the arguments as to "existing law," retroactivity, and collateral estoppel and res judicata, to the extent those terms were used and/or relied upon by this court and by the district court in reaching our prior decisions in this case, were rejected by the Supreme Court.
 
 
 19
 Therefore, the judgment of the district court on remand from the Supreme Court, dismissing Monolith's suit for refund, must be, and is, affirmed.
 
 
 Midwest
 
 
 20
 Midwest is a wholly-owned subsidiary of Monolith. Although Monolith's limestone quarries and cement manufacturing facilities are located in California, Midwest's are located near Laramie, Wyoming. The mining and manufacturing processes of Midwest are substantially identical to those of Monolith.
 
 
 21
 The district court entered its findings, conclusions, and judgment in the Midwest case after this court filed its opinion in the second Monolith case, 301 F.2d 488, but before the Supreme Court filed its opinion reversing that second Monolith decision by this court. As such, the district court followed the opinion of this court at 301 F.2d 488, as well as that court's own reasoning in its earlier opinions in both the first (168 F.Supp. 692) and second Monolith (unreported) cases.
 
 
 22
 The district court concluded that the cut-off point for Midwest for the taxable years 1951 and 1952 was the finished cement point. In so concluding, the district court reasoned:
 
 
 23
 "The record shows that there are many different kinds and types of limestone. Unlike some minerals and mineral products, there is no `national market' for `limestone'. Instead, limestone is customarily produced for local markets. The national statistics of `limestone sold or used' do not identify the different kinds and types and quantities of each which are sold in commerce." (C.T. 1297)
 
 
 24
 Apparently, the Supreme Court agreed no more with the district court than it did with this court, for in Monolith it relied on statistics in the Bureau of Mines Yearbook relating to "limestone sold or used in the United States" to reverse this court. The Supreme Court's opinions in Monolith and Cannelton hold that the cut-off point is established at that point in the processing "where the ordinary miner shipped the product of his mine;" "where the mineral first became suitable for industrial use or consumption." Riddell v. Monolith Portland Cement Co., 371 U.S. at 538, 539, 83 S.Ct. at 379. Yet it is not easy to be sure just what is the applicable "market," for the Supreme Court in Monolith referred both to the amount (tonnage) of limestone "sold or used" in the United States, and the amount "actually sold in California in 1952" (n. 2, p. 539, 83 S.Ct. p. 379).
 
 
 25
 We express no opinion as to what is the applicable market. But we are, obviously we think, required to remand the Midwest case to the district court for further proceedings in the light of the subsequent opinions of the Supreme Court and of this court in Monolith.
 
 
 26
 The Monolith case is affirmed; the Midwest case is remanded for further proceedings.